BERNE CORP. and B & B Corp., Twenty-one Queens Quarter, Inc., Miller Properties, Inc., Equivest St. Thomas, Inc., Robert Schmidt, Kim Holdsworth, Robert Schmidt Development Corp., and Dori P. Derr, The Cyril V. Francois Associates, LLC, Shell Seekers, Inc., Charles W. Consolvo, Linda B. Consolvo, Snegle Gade Associates LP, Charles W. Consolvo as Trustee of the Yvette B. Lederberg Trust, Arthur B. Choate, Stewart Loveland, and Stacy Loveland, Elisabeth Sharp, Lindon Corp., Gordon L. Coffelt, Soraya Diase Coffelt, and One Stop, Inc., Plaintiffs,

v.

GOVERNMENT OF THE VIRGIN ISLANDS, Roy Martin, in his official capacity as Tax Assessor, and the Board of Tax Review, Defendants.

Nos. CIV.2000–141, CIV.2000–167, CIV.2001–151, CIV.2001–155, CIV.2001–181, CIV.2001–196, CIV.2001–197, CIV.2001–228, CIV.2002–057.

District Court, Virgin Islands, D. St. Thomas and St. John.

May 12, 2003.

See also, 2000 WL 1689787.

James M. Derr, St. Thomas, VI, for plaintiffs Berne Corp. and B & B Corp., Miller Properties, Schmidt et al.

David A. Bornn, Rochelle Bermudez, St. Thomas, VI, for plaintiffs Twenty-one Queens Quarter, Inc, Cyril V. Francois Associates.

Chad C. Messier, William S. McConnell, St. Thomas, VI, for plaintiff Equivest St. Thomas, Inc.

David E. Nichols, St. Thomas, VI, for plaintiffs Shell Seekers.

Soraya Diase–Coffelt, St. Thomas, VI, for plaintiffs Lindon Corp. et al.

Kerry E. Drue, AAG, Wayne G. Anderson, AAG, Carol Thomas–Jacobs, AAG, St. Thomas, Michael McLaurin, AAG, St. Croix, VI, for the defendants.

**PROPERTY TAX LITIGATION CONSOLIDATED TRIAL ON ON COMMON ISSUES**

**MEMORANDUM**

MOORE, District Judge.

## I. SYNOPSIS

Although the Virgin Islands is a non-self-governing territory of the United

States, one of the areas of autonomy Congress has granted these Islands is the taxation of real property. All Congress requires is that the Territory design and implement a real property tax system based on the property's actual value. Unfortunately, the statutory framework for taxing real estate enacted by the Virgin Islands Legislature and the administration of this system by the Virgin Islands Tax Assessor and Board of Tax Review violates that federal mandate. The present Governor, his Attorney General, and the Tax Assessor, have known they are violating federal law since the Fall of 2000 when I granted the first plaintiffs' motion for a preliminary injunction. The Attorney General acknowledged as much in settling that case and agreeing to overhaul the process to insure that within two years all property would be assessed at its actual value. For whatever reason, the Governor decided to bypass that agreement and to relitigate the issue in these later-filed cases. Not only has the Attorney General thereafter been defending the indefensible in this Court, but also, during the very trial of these common issues, he mislead the Legislature into passing an amendment that obstructs the processes of this Court and perpetuates the illegal collection of property taxes without allowing for retroactive credits once the system complies with federal law.

In addition to the Executive Branch, the Legislature has also miserably failed the people of the Virgin Islands by not living up to its responsibility to determine how much revenue property taxes should contribute to the overall budget of the Virgin Islands Government. The best evidence of this shirking of legislative responsibility is the Legislature's failure to change the tax rate of 1.25 percent since it was set by Congress in 1936—almost seventy years ago. This failure to adjust the property tax rate to accommodate changes in the Government's budget puts undue and un-

necessary pressure on the Tax Assessor's levels of assessment, which I believe has affected the integrity of the property tax system and has contributed to its failure to provide reliable and credible assessments. The Legislature has further contributed to the illegality of the property tax system by enacting provisions over the years that prevent the Tax Assessor from appraising commercial and residential property at actual value.

I accordingly will enter a decree enjoining the Tax Assessor from appraising and assessing any real property in the Virgin Islands *until* he has upgraded the system of appraisal and assessment to comply with federal law by assessing each property on its actual value. I will also enjoin the Government of the Virgin Islands from requiring payment of real property tax bills for the 1999 tax year and later years *until* the Tax Assessor is capable of reliably and credibly appraising and assessing all real property at its actual value *and* the Board of Tax Review consistently holds timely hearings and reaches timely decisions on all property tax appeals *and* the Department of Finance consistently remits any refunds resulting from Board's decision within the time prescribed by law.

## II. INTRODUCTION

With the very first lawsuit of this consolidated civil rights litigation against the Government of the Virgin Islands and its Tax Assessor, it became clear that the system for assessing and taxing real property in the Virgin Islands is broken and does not implement the federal statutory requirement that all real property must be assessed at its actual value. The Government explicitly recognized this in its settlement of the *Berne* Case in December of 2000 by agreeing to bring the Tax Assessor's assessment procedures and processes into compliance with the uniform national

appraisal standards, and to appoint an independent special master to review for compliance.

Unfortunately, but all too typically, rather than committing the necessary resources to fix its failed property tax system, the Government chose to ignore the *Berne* Settlement and relitigate the same issues in these other cases, elected to challenge this Court's federal question jurisdiction, failed to negotiate or conduct discovery in good faith, and, ultimately, decided to defend the indefensible at trial. The Government has lost on all counts: the Court of Appeals for the Third Circuit upheld this Court's jurisdiction and this Court is about to enjoin permanently the collection of property tax bills based on assessments made in violation of federal law, beginning with tax year 1999. But it is the people of the Virgin Islands who have truly lost by the Turnbull Administration's conduct of this litigation, for the real property assessment system still does not fairly or equitably tax their real property at its actual, fair market value.

On February 6, 2003, while this litigation was in progress and during the trial of the common facts and issues, the Governor of the Virgin Islands, Charles W. Turnbull, on the advice of his Attorney General, Iver Stridiron, sent to the Legislature and prompted those solons to enact a law that directly contradicts pre-existing orders of this Court and thus seriously obstructs the processes of this Court. In the face of this Court's valid and still binding ruling in *Berne* that the 1999 commercial property tax bills are based on an assessment process that violates federal law, the Attorney General misled Governor Turnbull into making certain representations in a letter dated February 2, 2003, to the President of the Legislature, Senator David Jones. The Governor wrote that

> [t]he Attorney General has stated, however, that it is his opinion that if the law

is changed, there would be no violation of the current Settlement Agreement. It is his opinion that the Government would still be able to continue with the process of sending out corrected commercial real property tax bills until such time as new appraisal guidelines are implemented.

(Letter from Governor Charles W. Turnbull to Senator David S. Jones of Feb. 5, 2003, at 2.) The Legislature later enacted, and the Governor signed into law, a provision that would use these illegal commercial property assessments for 1999 as "the basis of computing commercial property taxes for the tax years 2001, 2002, 2003, and 2004." Act of Feb. 27, 2003, No. 6574 (amending 33 V.I.C. § 2402(b)). Attorney General Stridiron did not even attempt to save the validity of the Act by recommending that it allow for credits to those commercial property taxpayers whose 1999 bills turn out to be excessive once their properties are reappraised and assessed at their actual values by a fair and equitable system. The net result of the amendment is that the Turnbull Administration and the Legislature would require Virgin Islands commercial property owners to pay four more years of property taxes that have been assessed in violation of federal law.

## III. GENERAL BACKGROUND

This is not the first time that special interests and the recalcitrance of local Virgin Islands officials have required federal intervention to correct the Territory's system for assessing and collecting real property taxes. The first time was almost seventy years ago, while drafts of the 1936 Organic Act were pending. The Congress of the United States exercised its legislative authority over this unincorporated territory to address an urgent problem with the assessment of real property taxes that "had been the target of criticism by all competent observers since the Virgin Is-

lands came under the American flag" in 1917. (Ex. J–1, Letter of Harold Ickes, Secretary of Interior Apr. 23, 1935.) According to the committee of local government officials appointed by the Governor, "there is little probability that an equitable assessed valuation property tax could be got through the local" municipal councils because they were "largely made up of large property owners." For this reason it was necessary for the Congress to act, while at the same time giving the local municipal legislatures as much latitude as possible by making the "Federal tax operative only in the absence of local legislation conforming to the Federal requirements." The rate of 1.25 percent was suggested by these local officials. (*Id.* Justification attached to Sen. Report 1973.) Accordingly, on May 26, 1936, it was declared to be "the policy of Congress to equalize and more equitably to distribute existing taxes on real property in the Virgin Islands of the United States and to reduce the burden of taxation now imposed on land in productive use in such islands." 48 U.S.C. § 1401.

Congress accomplished this harmonization by imposing an *ad valorem* property tax system that required real property to be taxed at 1.25 percent of its actual value. *See* 48 U.S.C. § 1401a ("For the calendar year 1936 and for all succeeding years all taxes on real property in the Virgin Is-

lands shall be computed on the basis of the actual value of such property . . . ."); *id.* § 1401b ("Until local tax laws conforming to the requirements of sections 1401 to 1401e of this title are in effect in a municipality the tax on real property in such municipality for any calendar year shall be at the rate of 1.25 per centum of the assessed value.").[1] The federal tax rate of 1.25 percent has never been changed and presently is codified at 33 V.I.C. § 2301. The Virgin Islands statute that originally implemented this federal *ad valorem* property tax set forth nine factors the assessor shall consider in computing the actual value of real property subject to taxation. *See* 33 V.I.C. § 2404(a). In 1985, the Virgin Islands Legislature added a provision that would allow the Tax Assessor to use a "capitalization of income method of assessment" for commercial property, but only if it "results in a greater assessment than if it is not utilized." *See id.* § 2404(b). Then, in 1988 the Legislature amended section 2402 to prohibit the Tax Assessor from "increas[ing] the valuation and assessment of noncommercial property more than 10% over the previous valuation and assessment except [in cases where improvements have been made to the subject property subsequent to the previous valuation and assessment or where the subject property was sold after the previous valuation and assessment]." *See id.* § 2402(a).

---

1. Section 1401b continued by allowing for local legislation to implement the federally imposed value-based tax:

> If the legislative authority of a municipality shall fail to enact laws for the levy, assessment, collection, or enforcement of any tax imposed under authority of this Act [48 USCS §§ 1401–1401e] within three months after the date of its enactment [May 26, 1936], the President shall prescribe regulations for the levy, assessment, collection, and enforcement of such tax, which shall be in effect until the legislative authority of such municipality shall make regulations for such purposes.

The municipal council for St. Croix promulgated its own regulations right away, but President Franklin D. Roosevelt's regulations governed St. Thomas until 1955. *See* 33 V.I.C. § 2404, Revision note, at 320 ("Based on section 5, Regulations of the President of the United States for the Levy, Assessment, Collection and Enforcement of an Assessed Valuation of Real Property Tax, at the Rate of One and One–Quarter Percent, in the Municipality of St. Thomas and St. John, Virgin Islands of the United States, prescribed December 31, 1936, as enacted into law for the entire Virgin Islands by Act March 31, 1955, No. 24, § 17.").

Plaintiffs are taxpaying owners of real property in the Virgin Islands who brought these consolidated civil rights actions against the Government of the Virgin Islands and its Tax Assessor to vindicate plaintiffs' federal statutory right to have their property appraised, assessed, and taxed based on its actual value. Plaintiffs cover the complete spectrum of all real property taxpayers in that they are owners of real property in the Districts of St. Thomas/St. John and St. Croix who complain about the method of assessing real property taxes on vacant land, agricultural land, commercial properties, residential properties, condominiums, and timeshare units. The parties tried their cases to the Court for seven days in January 2003 and I am now prepared to render my rulings on the issues of fact and law that are common to all.[2] I first recap the tortured procedural history of this litigation and recite this Court's federal and local jurisdiction over these complaints and the remedies available to the Court over the Virgin Islands property tax system.

## IV. PROCEDURAL AND JURISDICTIONAL BACKGROUND

### A. The Berne Injunction

In the first case filed (Civ. No.2000–141), Berne Corporation and B & B Corporation [collectively "Berne"] alleged that the defendants had illegally assessed the value of their commercial properties based on replacement value, rather than the actual value required by federal law. The *Berne* case set the pattern for all the other cases and resulted in a settlement in which the Government agreed to bring the Tax Assessor's Office into compliance with federal law.

Berne sued the acting tax assessor, Roy Martin ["Martin" or "the Tax Assessor"] in his official capacity under Section 1 of the Civil Rights Act of 1871, 42 U.S.C. § 1983. Section 1983 renders certain "persons" liable for deprivations of federal statutory and constitutional rights.[3] The federal statutory right involved here requires that "all taxes on real property in the Virgin Islands *shall be* computed on the basis of the actual value of such property ...." 48 U.S.C. § 1401a (emphasis added). Although Berne can not sue a territorial official such as Martin in his official capacity for money damages under section 1983,[4] Berne and the other plaintiffs can and did seek under section 1983 to enjoin Martin from continuing to deprive them of their federal statutory right and to mandate that he assess their property on its actual value as required by that federal statute.[5]

---

2. The unique or non-common factual and legal issues, including the proof of actual value of the respective properties will be determined in the individual cases.

3. Section 1983 states in relevant part:

 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any ... Territory ..., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

4. *See Nibbs v. Roberts*, 31 V.I. 196, 206, 1995 WL 78295 (D.V.I.App.Div.1995) (citing *Ngiraingas v. Sanchez*, 495 U.S. 182, 110 S.Ct. 1737, 109 L.Ed.2d 163 (1990)).

5. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 n. 10, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'") (quoting *Kentucky v. Graham*, 473 U.S. 159, 167, n. 14, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)); *see also Berne*, 120 F.Supp.2d at 533–35 (finding that section 1401a created a federally protected right ac-

Berne included a taxpayer's suit under 5 V.I.C. § 80, as more fully discussed below.

On September 21, 2000, I ruled "that 48 U.S.C. § 1401a creates a federally protected right actionable pursuant to 42 U.S.C. § 1983." *Berne Corporation v. Government of the Virgin Islands*, 120 F.Supp.2d 528, 535 (D.Vi.2000). I also held that plaintiffs have standing to bring suit under section 80 on behalf of all similarly situated taxpayers to restrain violation of the statute requiring property taxes to be based on actual value. *Id.* Finding that plaintiffs met all the prerequisites, I preliminary enjoined the Government and its Tax Assessor from assessing and collecting commercial property taxes in violation of 48 U.S.C. § 1401a. The Government initially appealed my ruling, but later withdrew its appeal upon reaching a settlement with Berne. Accordingly, this ruling remains binding on the defendants.

## B. The *Berne* Settlement

The parties negotiated a settlement of the litigation, which I approved on December 19, 2000. The Government and the Tax Assessor agreed to bring the Virgin Islands real property tax system into compliance with the federal requirement that property be assessed on its actual/market value and to select a special master to

a. ... review the procedures and process to be used by the Virgin Islands Tax Assessor's office in appraising commercial properties pursuant to a mass appraisal approach and Uniform Standards of Professional Appraisal Practice (Hereinafter referred to as "USPAP") Standards. For appeal purposes only, USPAP standards for single property appraisal will apply. *(Subject to Jurisdictional Exception of USPAP)*

b. ... certify the procedures to be used as proper.

c. ... do appropriate random sampling, of no more than ten percent 10%, of assessments for compliance [and]

d. ... submit a report to the Court, as to compliance, every 180 days for a period of two (2) years ....

(Ex. 10.) I approved the parties' joint stipulation naming Joseph E. Hunt ["Hunt"] as special master on February 14, 2001, and the Government officially retained Hunt on April 16, 2001.[6] Hunt

tionable for injunctive relief under section 1983).

**6.** Hunt is a Lecturer in Public Finance and Government at the University of North Carolina School of Government at Chapel Hill. He has been involved in the field of real property assessment for approximately 35 years, and has vast experience in both single property and mass appraisals. (Hunt Test., Tr. I at 103–105.) Hunt has an MAI designation, meaning that he is a member of the Appraisal Institute, and a CAE ["Certified Assessment Evaluator"] designation from the International Association of Assessing Officers ["IAAO"], of which he is a member and past President. Hunt has authored numerous papers on various subjects on mass appraisal and property valuations, served on the editing committee of a mass appraisal book published by IAAO, and authored the chapters on the cost approach and cost estimation in a book titled *Property Appraisal and Assessment Administration* published by IAAO, which is an authoritative publication on assessing practices and procedures used throughout the United States. (*Id.* at 102–104.) The IAAO, an organization of approximately 8,500 members, is recognized as the leading authority on property tax administration and mass appraisal in the world. Its function is to conduct educational programs, set standards, and improve the assessment and administration of real property taxation throughout the world. (Id. at 177; Martin Test., Tr. II at 54.) Hunt chaired the work group of IAAO that in 2002 re-wrote Standard 6 of USPAP, which relates to mass appraisals. (Hunt Test., Tr. II at 97, 103–105.) Finally, Hunt has himself been a tax assessor and does a significant amount of consulting throughout the United States on mass appraisal, its application, and assessment administration. (Hunt Test., Tr. I at 102–105; Tr. II at 105.)

inspected the Tax Assessor's Office in June to familiarize himself with the office's organizational structure and make a preliminary evaluation of the components of the Virgin Islands real property assessment system. In August, Hunt met with Martin, tax consultant Kenneth Voss and other members of the Tax Assessor's Office staff to discuss the Territory's current tax assessment system and what was needed to bring it into compliance with US-PAP.

In September 2001, after the Government had issued the 2000 property tax bills based on the concededly illegal methods of assessment, Berne and 21 Queen's Quarter moved to enforce the settlement agreement. At a September 21 hearing, I denied the motion to enforce as premature, noting that the *Berne* Settlement gave the Government two years to bring its assessment system into compliance. I encouraged the parties to continue to communicate and work with each other to establish the new assessment system. The Government's delay in implementing the settlement and the 2000 property tax bills, however, allowed other property owners to file lawsuits.[7]

## C. The Government Voluntarily Extends the *Berne* Settlement to All Improved and Residential Property

One of these new plaintiffs, Equivest St. Thomas, Inc., successor to Bluebeard's Castle, Inc. ["Equivest"][8] (Civ. No.2001–151), moved on September 14, 2001 for a preliminary injunction to enjoin the collection of its 2000 property tax bills. In their motion to stay all discovery except document production "Pending Implementation of Berne Corporation Settlement" filed on December 21, 2001, defendants made a binding judicial admission that "[p]ursuant to the terms of that settlement, all commercial property in the Virgin Islands is to be appraised at actual value in accordance with 48 U.S.C. § 1401a, and 33 V.I.C. § 2404, and in accordance with the Uniform Standards of Professional Appraisal Practice." (Defs.' Mot. to Stay Disc., at ¶ 1 (filed in Civ. No.2001–155).) The defendants specifically represented to the Court that the "new procedures are being implemented with regard to commercial properties first, and when completed, will then be implemented with regard to residential properties." (*Id.* at ¶ 4; *see also* Defs.' Opp. to Plaintiff's Mot. for Prelim. Inj. and Defs.' Opp. to Plaintiff's Mot. to

---

**7.** Shell Seekers, Inc., Charles W. Consolvo and Linda B. Consolvo, Snegle Gade Associates, a Limited Partnership, Charles W. Consolvo, Trustee of the Yvette B. Lederberg Trust, Stewart Loveland and Stacy Loveland, and Arthur B. Choate, own commercial and residential real properties in St. Thomas, Virgin Islands and challenge tax assessments for various years from 1994 through 2001. Lindon Corporation owns commercial real property and raw land on St. Thomas and challenges assessments from 1994 to 2001. Gordon L. Coffelt owns agricultural land and challenges assessments from 1992 to 2001. Miller Properties Inc. owns commercial real property on St. Thomas and challenges assessments from 1997 through 2001; Miller Properties also owns commercial real property on St. Croix and challenges its assess-

ments for 1997 through 2001. Cyril V. Francois Associates, LLC, owns commercial real properties on St. Thomas, and challenges assessments from 1999 to 2001. Robert Schmidt, Robert Schmidt Development Corp., Kim Holdsworth, and Dori P. Derr are residents of St. Thomas, Virgin Islands who own improved and unimproved residential real properties and challenge assessments for the above described properties for various years. Elisabeth Sharp is an adult resident of St. Thomas who owns residential properties and challenges assessments from 1996 to 2001.

**8.** Bluebeard's Castle, Inc./Castle Acquisitions, Inc. became Equivest by merger on November 1, 2001.

Deem Mot. for Prelim. Inj. Conceded, at ¶ 3) (filed in Civ. No.2001–155) ("It is anticipated that the new system, once implemented, will value all commercial and residential real properties at 'actual values' in accordance with 48 U.S.C. § 1401a and 33 V.I.C. § 2404, and in accordance with the Uniform Standards of Professional Appraisal Practice ('USPAP'), in accordance with the terms of the settlement."); Tr. II at 116–118; Martin Test., Tr. II at 180, 187–188; Tr. Hr'g *Berne v. Government of the Virgin Islands,* Civ. 00–141, Sept. 21, 2001 at 61–62).)

Based in part on these judicial admissions, on January 31, 2002 I granted the defendants' motion to stay all discovery except document production. The Government also asserted willingness to settle all of these cases, but claimed that it could not simultaneously litigate and implement the new assessment system. Several new plaintiffs were able to negotiate settlements.[9]

### D. The Equivest Injunction

On May 21, 2002, Equivest renewed its motion to preliminarily enjoin the collection of its 2000 property tax bills after settlement discussions with the defendants proved fruitless. At a hearing on June 5 the defendants moved to dismiss the case for lack of subject matter jurisdiction and argued that Equivest was not entitled to injunctive relief because it had failed to exhaust its administrative remedy of appeal to the Board of Tax Review. Finding Equivest's claims to be valid and the de-

fendants's arguments to be meritless, I granted Equivest's motion for preliminary injunction in part on June 18, 2002, reaffirmed this Court's federal question jurisdiction and enjoined the Government "from collecting property taxes against the hotel properties owned by Equivest St. Thomas, Inc. until the tax assessor can establish at a trial on the merits that the property taxes on those properties have been assessed on their actual value." *Equivest St. Thomas, Inc. v. Government of the Virgin Islands,* 208 F.Supp.2d 545, 553 (D.Vi.2002), *aff'd sub. nom., Bluebeard's Castle, Inc. v. Government of the Virgin Islands,* 321 F.3d 394 (3d Cir.2003). I also rejected defendants' claim that Equivest had not exhausted its administrative remedies by failing to file an appeal with the Virgin Islands Board of Tax Review.

By this time it had become obvious that the politicians in the Turnbull Administration had decided to litigate rather than to implement the settlement agreement and correct the admittedly broken real property assessment system. With this change in posture, I acknowledged that the Court might have to reconsider the stay on discovery. On July 2, I lifted the stay on discovery and set these cases for trial on October 21, 2002.

### E. The Defendants Obstruct the Discovery Process

On August 20, Equivest moved the Court to compel the defendants to respond

---

**9.** On September 19, 2002 the parties to *Chateau St. Croix, LLC v. Government of the Virgin Islands,* Civ. No.2001–173, stipulated to the dismissal of their action after reaching a full settlement. On October 3, 2002, the parties to *Miller Properties, Inc. v. Government of the Virgin Islands,* Civ. No.2001–151, settled their dispute in regard to one of the properties listed in plaintiff's lawsuit, namely Orange Grove on St. Croix. They were unable to

reach an agreement on plaintiff's other property, the Buccaneer Mall on St. Thomas. Finally, on the first day of trial, the parties to *Sugar Bay Club & Resort Corp. v. Government of the Virgin Islands,* Civ. No.2001–240, presented to the Court that they had reached a full settlement and did not participate in the trial, although no stipulation of dismissal has yet been filed with the Court.

to its interrogatories and document production requests. Finding that the defendants "ha[d] taken a rather cavalier attitude toward their obligations to supply discovery,"[10] I ordered them to fully and completely respond to Equivest's discovery requests. Two months later, on October 22, I again had to admonish the Government for its "continuing obfuscation of the discovery process and its failure to comply with my August 27th order." *See In re Tax Litig.*, Civ. No.2000–141 *et al.*, 2002 U.S. Dist. LEXIS 22354, at *2 (D.V.I. Oct. 22, 2002) (granting in part Equivest's motion for discovery sanctions and overruling Government's objections to discovery requests).

In the meantime, the defendants moved to continue the October 21 trial date on the ground that they were unable to conduct both discovery/trial preparations and settlement negotiations. At the September 17 hearing, and upon the Government's reasserted willingness to negotiate settlements, I continued the trial to January 6, 2003. At the request of the parties, I also scheduled individual cases for settlement conferences. Unfortunately settlement negotiations promptly broke down again, mainly due to the Government's refusal to disclose the re-appraisal reports of tax consultant Kenneth Voss for the individual properties on the ground of privilege.[11]

After reviewing *in camera* those Voss reports that had been completed, I found the Government's claim of privilege to be baseless and ordered the immediate disclosure of the reports to the plaintiffs. *See In re Tax Litig.*, Civ. No.2000–141 *et al.* (D.V.I. Nov. 19, 2002) (Order). When I denied the defendants' motion to reconsider this order, the Government petitioned the Third Circuit Court of Appeals for a stay. Only after the Court of Appeals refused to stay my order on January 9, 2003, three days into the trial of these common issues, did the Government finally turn over the Voss reports to the plaintiffs.

## F. This Court Has Jurisdiction over Federal Aspects of the Virgin Islands Property Tax System

■ On February 28, 2003, the United States Court of Appeals for the Third Circuit upheld this Court's federal question jurisdiction in these matters, ruling that Equivest "properly pled a federal claim" for equitable relief against Roy Martin in his official capacity as tax assessor for violation of plaintiff's federal civil rights under 42 U.S.C. § 1983. *Bluebeard's Castle, Inc. [Equivest] v. Government of the Virgin Islands*, 321 F.3d 394, 396 (3d Cir. 2003). Rejecting the Government's con-

---

**10.** For example, defendants failed to identify the specific documents among the 230 discovery exhibits produced or to identify which of those documents defendants claim were privileged or what documents, if any, had not been produced in reliance on a privilege. Defendants merely referred plaintiffs to the documents produced, or merely asserted that virtually all the document requests were "overbroad" and, for many more document requests, as well as interrogatories, asserted the blunderbuss objection that they sought "irrelevant information, ... confidential information, ... inadmissible information, and ... privileged information." I found the Government's approach to discovery totally

unacceptable. *See Equivest, Inc. v. Government of the Virgin Islands*, 208 F.Supp.2d 545 (D.V.I.2002) (Order).

**11.** Sometime during the summer of 2001 the Government hired Kenneth Voss as a consultant to the Tax Assessor's Office for the purpose of implementing the Berne Settlement, although his contract was not officially signed until January 25, 2002. I had ordered the Government to disclose the Voss report to plaintiff Lindon Corporation before the scheduled September 30 settlement conference. The Government, however, refused to turn the report over and the conference apparently never took place.

tention that there is no federal jurisdiction because this dispute arises solely under Virgin Islands law, the Court of Appeals affirmed that the 1936 federal statute, 48 U.S.C. §§ 1401–1401e, "contemplates a hybrid scheme of real property law: the general requirements are set by the federal government, with specifics established as a matter of territorial law consistent with federal law." *Id.* at 398. Thus, section 1401a's requirement that all real property in the Virgin Islands be assessed at its actual value still binds the Government of the Virgin Islands and its tax assessor.

The principles of federalism and comity do not require the hands-off approach a federal court must adopt regarding the administration of a sovereign state's property tax system because the Virgin Islands property tax law does not derive its local character from the separate sovereignty of a state within the federalism embraced by the Constitution. By the grace of Congress in a self-restrained exercise of its authority under the Territorial Clause of the Constitution and the infamous *Insular Cases,*[12] Congress only requires the Virgin Islands to establish and maintain a system

designed to assess the tax on real property's actual value. The local Government otherwise has complete autonomy over its property tax system.

■ As the Court of Appeals found, the Virgin Islands "tax system is not a state tax system, nor is it entirely a territorial tax system. It is partially a federal tax system, and it is not apparent that the federal government should adopt a hands-off approach to the federal aspects of a hybrid federal/territorial system." *See Bluebeard's Castle,* 321 F.3d at 400. Thus, for example, this Court is not subject to the prohibition on tax injunctions under the Tax Injunction Act, which prevents a district court from enjoining, suspending or restraining "the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. The Tax Injunction Act simply does not apply to the District Court of the Virgin Islands. *See Equivest,* 321 F.3d at 397 n. 5; *Pan Am. World Airways v. Duly Authorized Government of the Virgin Islands,* 459 F.2d 387, 391 (3d Cir. 1972).

---

**12.** The present internal governmental structure of the Territory of the Virgin Islands is purely a creature of the United States Congress whose members are selected in elections in which the people of the Virgin Islands have no vote. Congress retains unilateral authority over the Virgin Islands under the Territorial Clause of the Constitution, U.S. CONST. art. IV, § 3, cl. 2 ("The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . . ."), and the *Insular Cases. See, e.g., Balzac v. Porto Rico,* 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627 (1922); *Downes v. Bidwell,* 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901). For example, the local legislature's power to enact laws is "subject to the power of Congress to annul any such Act of the legislature."). REV. ORGANIC ACT § 8,

48 U.S.C. § 1574(c). As a result, the Territory of the United States Virgin Islands is one of only sixteen "non-self-governing territories" remaining in the world today. *See* Information from Non–Self–Governing Territories transmitted under Article 73e of the Charter of the United Nations, U.N. GAOR, 57th Sess., U.N. Doc. No. A/57/23 (Jul. 8, 2002) ["Information from Non–Self–Governing Territories"]. Being a non-self-governing territories, the Virgin Islands continues to be subject to the efforts of the "Special Committee on the Situation with regard to the Implementation of the Declaration on the Granting of Independence to Colonial Countries and Peoples," and the United States must report to the United Nations on its progress toward the decolonization of the Virgin Islands. *See id.* (annex).

The Court of Appeals went on to limn this Court's federal question jurisdiction in these cases.

> Congress was not required to treat the Virgin Islands as though it were sovereign, but in large measure it has chosen to do so. The tax system is, for the most part, a matter of local governance. And the territorial courts, mirroring state courts, have been given primary jurisdiction over local matters. Accordingly, although § 1401a adds a significant federal element to the Virgin Islands tax regime, it remains a local system—created, enforced, and adjudicated locally. . . .
>
> . . . . .
>
> [Thus, a]n aggrieved taxpayer does not state a federal claim by objecting that its taxes are not based on the actual "actual value" of its property. If an assessor arrives at a figure greater than what the taxpayer believes to be the correct number, the assessor has not necessarily violated the requirement that the tax assessment be based on actual value. Only if the assessment *method* does not constitute a reasonable attempt to determine the actual value can a claim be brought under § 1401a. A challenge to the *system* of tax assessments in federal court may be permissible depending on whether it directly implicates federal law; an ordinary challenge to an assessment must be brought in territorial court.

Plaintiff here has adequately alleged a violation under 48 U.S.C. § 1401a. It contends defendants systematically employed a method of assessment not calculated to determine the actual value of its properties. Because plaintiff's claims "arise under" § 1401a, they are subject to the jurisdiction of the District Court under 48 U.S.C. § 1612 [granting jurisdiction of United States district court] and 28 U.S.C. § 1331 [granting jurisdiction over federal questions].

*Id.* at 401, 402 (citation omitted).

### G. This Court Has Supplemental Jurisdiction over Plaintiffs' Taxpayer Suit (5 V.I.C. § 80)

■ The *Berne* plaintiffs included a taxpayer's suit under Virgin Islands law to restrain Martin from assessing and the Government from collecting property taxes on real property in the Virgin Islands until such assessments and taxes are redetermined based on the actual value of each property. *See* 5 V.I.C. § 80 ("A taxpayer may maintain an action to restrain illegal or unauthorized acts by a territorial officer or employee, or the wrongful disbursement of territorial funds."). This Court has supplemental jurisdiction over plaintiffs' non-federal, territorial taxpayer suits authorized by Virgin Islands law pursuant to 28 U.S.C. § 1367(a) (district courts having original jurisdiction "shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy"). The plaintiffs have since expanded their claims under section 80 to include injunctive and declaratory relief against the Government and its Board of Tax Review for consistently failing to comply with the Board's enabling legislation.

## IV. THE SYSTEM OF PROPERTY TAX ASSESSMENT

### A. The Purpose

Although this case mainly involves the role and methodology of the Executive Branch acting through its Tax Assessor, it is equally important to acknowledge that the Legislature has utterly failed to understand and perform its role in this process. The roles of the three branches of government in taxing property in the Territory of

the Virgin Islands are well stated in the 1970 manual used by the Tax Assessor, outdated though it may be as a guide for the Tax Assessor's Office.

All three branches of government—the legislative, the executive, and the judicial—are involved in the taxation of property. The revenue to be derived from property is a decision of the legislative body, but before the amount of revenue can be determined by fixing the tax rate, the executive branch, through the assessor, must establish the property tax base on which taxes are to be computed by determining the valuation of taxable property. The function of the judicial branch is to review, on appeal, the legality of legislative and administrative acts....

(Def.'s Ex. G1, Introduction to REAL PROPERTY ASSESSMENT, Manual of Procedures 3 (2d ed. 1970) ["Manual"].) [13] The Legislature has never lived up to its responsibility to determine how much revenue property taxes should contribute to the overall budget of the Virgin Islands Government. The best evidence of this shirking of legislative responsibility is the fact that the Legislature has never changed the tax rate of 1.25 percent (0.0125) since it was set by Congress in 1936—almost seventy years ago. This is relevant to these proceedings because it lends itself to abuse, as the special master, Joe Hunt, observed.

Hunt discussed the interplay between the roles of the Legislature in setting the budget and tax rate and the Executive assessing the property values. He described them as the "assessment function", the "budget function", and the "property tax levy".

[T]he *assessment function* produces a taxable assessment base for all property in the jurisdiction. The assessment base is used to distribute the property tax to property owners according to the value of the property owned. The *budget function* determines how much money must be raised by the property tax. The *levy* is the legal act of enacting the property tax to raise the required amount of money necessary to fund governmental expenditures. The levy is expressed as a property tax rate. The resulting property tax rate is simply the total dollar amount of the jurisdiction's budget (that will be funded by the property tax) divided by the total assessment base. When the tax rate is multiplied by an individual property assessment, the tax for that property will be calculated.

. . . . .

If assessment values are not tied to some uniform measure of value (Market Value) and applied in the same manner to all properties, the result is a shift of the property tax from one group of taxpayers to another group

. . . . .

*The assessed value is not intended to function as the means to increase or decrease revenue to the jurisdiction* because value is controlled by market influences and not by budgetary needs, and therefore is not reliably predictable

. . . . .

(Ex. J–3, Special Master's Report, July 24, 2002, at 3–4 (underline in original; italics added).)

Joe Hunt went on to report that, "[h]istorically, the Virgin Islands Government has not adjusted the property tax rate to fund increasing budget demands," and that

---

**13.** The Manual was originally published in 1960 and revised in 1970. It purports to contain the policies and procedures of the Tax Assessor's Office for the tax assessment of all properties in the V.I. and was admitted in evidence as the Court's Exhibit 3.

this "inability or reluctance to adjust the tax rate to reflect changes in the government's budget puts an undue amount of pressure on assessment levels." (*Id.* at 6.) At trial Hunt testified that he was concerned "over the integrity of the property tax system" because the tax rate had been static for so many years. (Hunt Test., Tr. 1 at 154.)

The Tax Assessor's thirty-year-old Manual also describes the role of the assessment function.

> The primary objective of the assessment function is to provide the basis for spreading the levy on property in proportion to the value of each individual's ownership, thereby establishing the proportion of the tax burden each is to bear. The omission of property or its under valuation results in an increase in the amount which the owners of other property not so favored must pay. The assessor—and, with him, the board of Tax Appeals [Tax Review]—are charged with a responsibility that is vital to the interests of each and every owner of taxable real property in the Virgin Islands.

(Manual at 3.) In addition to the Legislature's abdication of its responsibilities, the system of assessment as presently established and operated by the Tax Assessor is structurally incapable of equitably and reliably implementing the federal statutory mandate of taxing all real property on its actual value. Moreover, the Board of Tax Review is utterly useless as a safety net to correct the Tax Assessor's systemic errors.

### B. Some Definitions

*Actual value equals fair market value.* The terms actual value and fair market value are synonymous and may be used interchangeably, per the former Tax Assessor, (*see* Callwood Test., Tr. I at 250–251, 255),[14] as confirmed by the Special Master, and plaintiffs' experts Kathleen Conroy and Steven Jamron, (*see* Hunt Test., Tr. I at 112, 203; Conroy Test., Tr. IV at 225–226, 229–230.) Similarly, the Tax Assessor's Manual indicates that real property should be taxed on market value. (*See* Manual at 12 ("there has emerged a term that has been sanctioned by the courts as the accepted concept of value for assessment purposes and on which taxes are to be computed. This term is market value.").) The equivalence of actual value and market value is clinched by the web site for the Office of the Tax Assessor:

> The Tax Assessor does not dictate values. The actual value is determined from the market. This is the amount that your property may bring in the open market between a willing buyer who is fully informed of all the advantages and disadvantages of your property and as a willing seller is fully informed and under no duress to sell would accept.

(Ex. J–9, www.ltg.gov.vi/departments/tax-detail.html.)

*Mass Appraisal/Single Property Assessment.* Mass appraisal is "the process of valuing a universe of properties as of a given date using standard methodology,

---

14. The Tax Assessor's inconsistent testimony under oath was both disingenuous and threatening to his continued liberty. Compare Martin's sworn testimony at trial:

> Q: Is it the position of the Tax Assessor of the Virgin Islands that "actual value" as used in Section 2404 is synonymous with the term "fair market value"? Just "yes" or "no".
> A: No.

with Martin's deposition testimony of December 11, 2000 under oath:

> Q: [W]ould you agree that the terms "market value" and "actual value" are essentially the same?
> A: Yes.

(Martin Test., Tr. I at 266. *See also* Martin Test., Tr. I at 265–268, 275–276; Martin Test., Tr. II at 55–56, 265–266.)

employing common data, and allowing for statistical testing." (Ex. J–2, Special Master's Report, Jan. 15, 2002, at 2.) The components needed to produce a credible and reliable mass appraisal are a good mapping system, a good database that describes all the appropriate property characteristics, an analysis system to convert market data to assessment values, a trained and competent staff able to interact with the system and to review the estimates of value of the system, a data processing system able to handle the requisite number of appraisals on an annual basis, and a review system to verify the quality of the valuations and compliance with statutory requirements. (Hunt Test., Tr. I at 117–118.) In contrast, a single property appraisal is an appraisal of a single property to produce an estimate of its actual value. (*Id.* at 118.)

Market value for property tax assessment purposes is generally determined through the application of mass appraisal techniques. Although the techniques differ between a mass appraisal and a single property appraisal, the goal of both techniques is the same, namely, to arrive at the actual/fair market value of real property. (*Id.* at 120.) Because both a mass appraisal and a single property appraisal attempt to reach an accurate estimate of a property's the market value, a single property appraisal is a valid and recognized means of checking a mass appraisal valuation. (*Id.* (agreeing that "the goal of the mass appraisal system is to arrive at a value for each individual parcel subject to the assessment that would be roughly equal to the fair market value as determined by a single property appraisal.").) For this reason, it is accepted practice, both generally and by the Office of the Tax Assessor, to consider an individual appraisal in determining the accuracy of a mass appraisal valuation. (Callwood Test., Tr. I at 258; Martin Test., Tr. VI at 156–157; Jamron Test., Tr. V at 54.)

*Uniform Standards of Professional Appraisal Practice.* USPAP is the generally accepted and recognized minimum standards of appraisal practice in the United States. (*See* USPAP, Forward (Appraisal Standards Board, 2002); Hunt Test., Tr. II at 97–98, 104.) Standard 6 of USPAP, "Mass Appraisal, Development and Reporting" specifically applies to mass appraisals and requires that, "[i]n developing a mass appraisal, an appraiser must be aware of, understand, and correctly employ those recognized methods and techniques necessary to produce and communicate credible mass appraisals." The term "appraisal" or "mass appraisal" refers to the process which produces a value; "assessment" is the statutory conversion of appraised value to taxable value, (*see* Hunt Test., Tr. II at 99); the Virgin Islands defines the assessed value as the actual value of the property, although the tax is levied on sixty percent of the assessed or actual value, *see* 33 V.I.C. § 2301(a).

The "Jurisdictional Exception Rule" of USPAP, mentioned in the *Berne* Settlement, states that, "[i]f any part of these standards is contrary to the law or public policy of any jurisdiction, only that part shall be void and of no force or effect in that jurisdiction." The purpose of this rule is strictly limited to providing a saving or severability clause to preserve the balance of USPAP if one or more of its parts is contrary to the law or public policy of a jurisdiction. (USPAP, Comment to the Jurisdictional Exception Rule at 8.)

*IAAO Standard on Ratio Studies.* One of the recognized methods of evaluating the reliability and credibility of the assessment values produced by a mass appraisal system is through "ratio studies". (Hunt Test., Tr. I at 179–180; Callwood Test., Tr. I at 259; Martin Test., Tr. II at 65–66.) A ratio study is a generic term for any comparison of assessed values estimated for tax purposes with market values derived

independently from actual recorded sales prices or independent appraisals. The components of the ratio are the tax assessor's assessed values as the numerator and the independently derived market values as the denominator. (Standard on Ratio Studies §§ 5.1.2 and 5.1.3 (IAAO 1999); Hunt Test., Tr. I at 180.) Obviously, the ideal is a ratio of 1, which happens when assessed value equals market value (assessed ÷ market = 1). Assessors and taxpayers can use ratio studies to evaluate how fairly the computer's mass appraisal program distributes the real property tax burden, that is, how close appraised/assessed values approximate actual/market values. (Standard on Ratio Studies § 2.3.3; Hunt Test. Tr. I at 178.)

Unfortunately, the Virgin Islands does not have its own ratio study performance standards, (Martin Test., Tr. II at 76–78), even though Martin is a member of the IAAO and the IAAO standards state that "each state, province, and local jurisdiction should have ratio study performance standards." (Standard on Ratio Studies § 14 (Ex. J–11); Martin Test., Tr. II at 53.) Moreover, USPAP standards and IAAO standards are "fairly synonymous". (Hunt Test., Tr. II at 97.) For example, Canon 6 of the IAAO Code of Ethics and Standard of Professional Conduct requires all IAAO members to comply with USPAP. Indeed, IAAO Ethical Rule 6.1 states that it is unethical for an IAAO member to fail to observe the requirements of USPAP. Martin claimed that ratio study performance standards for the Virgin Islands are in the Manual, but never was able to point them out to the Court. The Manual does warn, however, that, "[i]f the difference between the stated consideration and the appraised value is significant, it is a signal that there may be something wrong with the appraisal." (Manual at 108.)

In lieu of any local ratio study performance standards to assess the Tax Asses-

sor's performance and compliance with the *Berne* Settlement, the plaintiffs presented at trial and the Court adopts the IAAO's suggested ratio study performance standards for jurisdictions where market/actual value is the legal basis for assessment. These are set forth in Table 7 of the Standard on Ratio Studies, according to which "[t]he overall level of appraisal of the jurisdiction and each major class of property (such as residential, commercial/industrial, and vacant land) should be between 0.90 and 1.10 (within ±10 percent of the statutorily required level of assessment)." (Standard on Ratio Studies at § 14.1 & Table 7; Hunt Test., Tr. I at 122–123.)

## C. The Three Main Appraisal Approaches or Models

The three main approaches to appraising real property, the cost approach, the sales comparison approach and the income approach, all may be used in either a mass appraisal system or a single property appraisal. The goal of all three is to reach a reliable estimate of the actual, *i.e.*, fair market value of real property. The cost approach and the sales comparison are not defined or even mentioned in the relevant provisions of the Virgin Islands Code, mainly 33 V.I.C. § 2404. Although the income approach is defined in section 2404(b), the Tax Assessor can use it only if it increases the assessed value. All three approaches, however, are set forth in the Manual, which the previous Tax Assessor described as his "bible". (Callwood Test., Tr. 1 at 236.)

The *cost approach* to appraising property improved with structures begins with the replacement cost new of the improvements, subtracts depreciation, whether physical or caused by functional or economic obsolescence, then adds in the value of the underlying land. The land value is most frequently determined by the sales

comparison approach. The cost approach is based on the principle that a rational, informed purchaser would pay no more for a property than the cost of constructing an acceptable substitute. The cost approach is thus less reliable when an informed buyer in the marketplace would be inclined to pay less for an improved property than the cost to replace the buildings on it. This often is the case for income producing property, because the buyer will rely more on the income the property generates rather than what it would cost to replace it, and for older structures as well, where depreciation is subjective and difficult to measure.[15]

The *sales comparison approach* estimates a property's value by reference to fair market sales of comparable properties. This approach is generally viewed as the most reliable of the three approaches since there is no better evidence of market value than recent sales of comparable property in the marketplace between a willing and knowledgeable buyer and a willing seller dealing with each other at arms length. (*See, e.g.,* Standard on Ratio Studies § 2.1 (IAAO 1999) ("Sales prices provide the only objective estimates of market values and under normal circumstances should provide good surrogates of market value"); Callwood Test., Tr. I at 238 (if sufficient market information is available, comparable sales is the "best answer, because the answers are already there"); Martin Test., Tr. IV at 39.)

The *income approach* to valuation is based on the concept that current value is the present worth of future benefits to be derived from the income the asset can be expected to produce over the remainder of its economic life. The income approach uses capitalization to convert the projected benefits into an estimate of present value. This generally is the most reliable approach to valuation for income producing properties. (Callwood Test., Tr. I at 238 (after comparable sales, income approach is the "next best" approach); Conroy Test., Tr. IV at 254–255.)

## V. THE DEFENDANTS ARE VIOLATING FEDERAL LAW

### A. The Virgin Islands Statutory Scheme for Real Property Assessment Violates the Federal Requirement to Tax Actual Value by Allowing the Use of the Income Approach Only if it Increases the Assessed Value of Commercial Property and by Restricting the Maximum Annual Increase for Residential Property to Ten Percent

■ The Virgin Islands Legislature added subsection (b) to 33 V.I.C. § 2404 in 1985 to restrict the tax assessor from using the income approach for assessing commercial property *unless* it "results in a greater assessment than if it is not utilized." *See id.* § 2404(b).[16] The Tax As-

---

**15.** *See In re The Greens of Pine Glen, Ltd.,* 147 N.C.App. 221, 555 S.E.2d 612, 615 (2001) (stating that "[t]he cost approach is better suited for valuing specialty property or newly developed property; when applied to other property, the cost approach receives more criticism than praise" and noting that "modern appraisal practice is to use cost approach as a secondary approach 'because cost may not effectively reflect market conditions.' ") (citations omitted).

**16.** Section 2404(b) provides as follows:

If the property being assessed is commercial property, the assessor may utilize a capitalization of income method of assessment in conjunction with utilization of the factors listed in subsection (a) of this section so long as the utilization of such method results in a greater assessment than if it is not utilized. For purposes of this section, the "capitalization of income method" is a method of assessing commercial property by the conversion of rent to the real property value by the utilization of a capi-

sessor clearly interprets 2404(b) as prohibiting him from using the income approach to reduce a commercial property owner's assessment, except in negotiations to settle a case in litigation. (Martin Test., Tr. II at 196–97.) Such a restriction directly conflicts with the clear mandate of federal law that all taxes on real property in the Virgin Islands be computed on the basis of actual value. (*See* Hunt Test., Tr. I at 107 (Section 2404(b) "is inconsistent with the expected estimates or research that an appraiser would do to estimate value described as actual market value").) Section 2404(b) must therefore be stricken as inconsistent with 48 U.S.C. § 1401a. I hardly need experts to tell me that section 2404(b)'s directive that the income approach be used only for the purpose of increasing the assessment constitutes a statutorily mandated "method of assessment not calculated to determine the actual value of its properties," to use the words of the Court of Appeals.

The experts merely confirmed that section 2404(b) is inconsistent with a determination of market or actual value, because investors in the marketplace use the income approach to determine value even if it decreases the property's value.[17] Thus,

section 2404(b) effectively creates unequal rates of taxation between non-commercial properties, which are to be taxed on fair market value, and plaintiffs' commercial properties, which are to be taxed without using the appraisal approach most appropriate for evaluating commercial properties. Martin testified that he has used only the cost approach to determine the value of improvements on all commercial properties during his tenure as acting Tax Assessor.[18] (Martin Test., Tr. VI at 111–14.) As will be discussed in the next section, the evidence confirmed that plaintiffs commercial properties indeed are being taxed on values artificially inflated above market value.

■ Although the parties did not dwell on it, 33 V.I.C. § 2402(a) restricts the ability of the Tax Assessor from fairly and reliably determining the actual or fair market value of residential property, except this time it skews the system in favor of the taxpayer. (*See* Martin Test., Tr. III at 59) (mentioning the additional statutory restriction.) Such a restriction again is inconsistent with the standard methods and expected research an appraiser would otherwise use to estimate actual market

talization rate applicable to the type of property involved. Determination of the capitalization rate shall be made by the Tax Assessor of the Virgin Islands after careful consideration of the comparable rate used by lending institutions.

**17.** (*See* Conroy Test., Tr. IV at 238–239 (stating that one could never have any type of credible result, uniformly arrived at, if section 2404(b) applied); Hunt Test., Tr. I at 162 (assessed value of commercial property with section 2404(b) applicable is not likely to equal fair market value); *id.* at 185–186 (section 2404(b) requires you to handle the income approach in a manner that is not considered supportive of a valuation that complies with a market value standard).) *See also Brummell v. Department of Revenue,* 1998 WL 201394 (Or.Tax Apr.17, 1998) (stat-

ing that the "law cannot mandate a rule which operates contrary to economic realities and at the same time requires real market value assessments").

**18.** Verne Callwood was the Tax Assessor before January, 1999, and used only the income approach to assess commercial real property during his tenure. He retired after serving in that position for approximately thirty-eight years and was responsible for all tax bills up to, but not including, the 1999 tax year. (Callwood Test., Tr. I at 232.)

Roy Martin has been serving as the *de facto* Tax Assessor of the Virgin Islands since January, 1999. (Martin Test., Tr. I at 264.) He is the *de facto* Tax Assessor because he did not fulfill the statutory requirement of taking an oath of office or posting a bond before taking his position. (Tr. II at 227–228.)

value.[19] Similarly, I do not need experts to tell me that this restriction directly conflicts with the clear mandate of federal law that all real property in the Virgin Islands be assessed its actual value. Section 2402(a) thus constitutes a statutorily mandated method of assessment not calculated to determine the actual value of residential real property. Accordingly, section 2402(a) must also be stricken as violating 48 U.S.C. § 1401a.

Section 2404 originally implemented the federal value-based property tax by setting forth nine factors for the assessor to consider in computing the actual value of real property: location and surroundings; quality or fertility; condition of structures; recent cost to the present owner; recent sale price of adjacent property; recent bona fide offer; accessibility; proximity to public facilities, conveniences and utilities; and rental or income derived directly from the property. *See* 33 V.I.C. § 2404(a). Martin interprets and implements section 2404(a) as an exclusive list of the only factors he can consider in determining the actual market value of real property. (*See* Martin Test., Tr. II at 56–57.) According to plaintiffs' expert, interpreting section 2404(a) as an exclusive list of assessment factors would be inconsistent with the assessment of actual value required by 48 U.S. § 1401a because these nine factors are

> not in and of themselves totally adequate for someone to determine market value.... [T]hey are incomplete in giving a professional appraiser or assessor all of the tools that you need to conduct an appropriate ... development of an appraisal process and apply methodologies and arrive at a reasonable and supportable opinion of value.

(Conroy Test., Tr. IV at 232–33;[20] *see* Hunt Test., Tr. I at 188 (noting that his

---

**19.** Section 2402(a) provides as follows:

(a) The tax assessor shall at least once every five (5) years, upon actual view, value and assess all noncommercial property subject to taxation in the Virgin Islands. Provided, however that the tax assessor shall not increase the valuation and assessment of noncommercial property more than 10% over the previous valuation and assessment except in the following cases:

(i) Where there has been an improvement to the subject real property subsequent to the previous valuation and assessment. Provided, however, that there shall be no increase over the 1987 assessed valuation except where there have been improvements which exceed $50,000.

(ii) Where there has been an improvement to the improvement, which occurred subsequent to the previous valuation and assessment. Provided, however, that there shall be no increase over the 1987 assessed valuation except where there have been improvements which exceed $50,000.

(iii) Where the subject real property has been sold subsequent to the previous valuation and assessment.

**20.** In her expert report, "Report on Specific Issues Related to 48 U.S.C.A. § 1401a and 33 V.I.C. § 2404" (Ex. J–41), Conroy grouped section 2404(a)'s 9 factors into three categories derived from USPAP: "property characteristics", "transactional history of a given property", and "recognized valuation methods and techniques". (Ex. J–41, at 3–7.) Conroy opined that section 2404(a)'s factors alone could not produce credible assessment values because several important factors were excluded. For instance, the statute does not allow the Tax Assessor to consider significant property characteristics such as fractional interests and partial holdings, legal attributes such as easements, restrictions, encumbrances, reservations, covenants, lease contracts, declarations, ordinances, land use regulations, trade fixtures and intangible items within the property, supply and demand for a given type of property and related market area trends, and the highest and best use of a site or improved property. (*Id.* at 4–5.). Similarly for a property's transactional history, the statutory factors of cost and recent bona fide offer were insufficient because they limited the Tax Assessor to recent costs and offers, rather than all transactions within a defined period. (*Id.* 5.). Finally, regarding the valuation method category, section 2404(a) completely fails to provide for any of the recognized valuation approaches or methodologies, let alone require their use. (*Id.* at

opinion that USPAP could be followed under § 2404(a) was premised on being able to consider factors in addition to those set forth in § 2404(a)).) In contrast to Martin's testimony at trial, the defendants' have taken the position in written pleadings that section 2404(a) "does not require exclusive application for the computation of actual value," and that nothing in its plain language limits "the tax assessor's consideration to only those nine elements listed." (Tr. II at 116–117.) Inasmuch as the Legislature will have to revisit the entire subtitle on real property taxes, namely Subtitle 2 of Title 33, Virgin Islands Code, Sections 2301–2584, to revise section 2404 and the other sections specifically mentioned here, and to modernize many more provisions, I will not formally rule that section 2404(a) is also voided by 48 U.S.C. § 1401a.

I find that plaintiffs have proved their federal claim that Roy Martin, acting in his official capacity as the Tax Assessor for the Government of the Virgin Islands, violated plaintiffs' civil rights under 42 U.S.C. § 1983 by systematically employing a method of assessment not calculated to determine the actual value of properties, as required by 48 U.S.C. § 1401a, namely, he did not use the income capitalization approach in appraising and assessing plaintiffs' commercial properties and abided by the limitation on the assessment of residential property imposed by 33 V.I.C. § 2402(a).

**B. The Tax Assessor Violates Plaintiffs' Civil Rights under 42 U.S.C. § 1983**

██ As already noted, Martin has only

used the cost approach to determine the value of improvements on all commercial properties during his tenure as acting Tax Assessor. I agree with the evidence that it is not consistent with USPAP to use only the cost approach if there are other methodologies or data that should be taken into consideration to arrive at fair market value. (*See* Conroy Test., Tr. IV at 252.) Even Martin stated on several occasions in testimony under penalty of perjury that using the cost approach exclusively did not conform to USPAP. (*See* Martin Dep. at 21–28, Dec. 19, 2002; Tr. of Prelim. Inj. Hr'g, *Equivest v. Government*, Civ. No.2001–155, at 91–92, June 2, 2002.) In another baffling instance of varying his testimony under oath, Martin changed his position at trial to say that exclusive use of the cost approach to assess commercial real estate would comply with USPAP. (*See* Martin Test., Tr. II at 59–60.)

**1. Ratio Studies: Confirmation that Martin's Mass Appraisal is not Calculated to Assess Actual Value**

One of the clearest pieces of evidence confirming that the present practices and procedures employed by the Tax Assessor's office to appraise real property are flawed and generate fundamentally unfair and unreliable assessments is plaintiffs Joint Exhibit 13. Exhibit J–13 is the sales ratio study for St. Thomas from January 1, 1997 through December 31, 1999 of only the "qualified" sales of improved real property, *i.e.*, it lists only land sales or sales of improved property that qualify as arms-length transactions. (Tr. II at 79, Martin Test., Tr. II at 119–120.) [21] All parties

6; and *see generally*, Conroy Test., Tr. IV at 231–39.)

**21.** USPAP requires that the quality and accuracy of a mass appraisal be verified. (*See* USPAP, Standard Rule 6.6.) Martin first testified that his office used ratio studies to validate the accuracy of his assessments, (Martin

Test., Tr. I at 303–304; Tr. II at 65–66; Tr. III at 29), but after the reliability of these ratio studies was discredited, Martin backpedaled to say that his office does not "look in-depth as to the mathematical calculations in the report" and uses the ratio report only to "compare the sales price to the assessments

agree that property sales that are not arms-length transactions are not appropriate for inclusion in a sales ratio analysis. Only sales of improved real property were analyzed in Joint Exhibit 13 because the majority of the plaintiffs' properties include improved real estate. Ideally, the ratio of Martin's assessed values to actual sales values at arms length would be 1, that is, the estimated values established by Martin's assessment system would equal the actual value in the marketplace. An acceptable ratio short of the ideal according to the Standard on Ratio Studies would be "between 0.90 and 1.10," *i.e.*, within ±10 percent of actual value. (Standard on Ratio Studies at § 14.1 & Table 7; Hunt Test., Tr. I at 122–123.)

At face value, the raw numbers on Exhibit J–13, produce an assessment to sales ratio of 0.90, taking the aggregate value of assessments of improved real property of $243,003,827 as the numerator and the aggregate value of arms-length market sales of improved real property of $268,702,405 as the denominator (243,003,827 ÷ 268,702,405 = 0.9). A ratio of 0.9 is at the outer edge of the acceptable IAAO performance range and only 10 percent off the ideal ratio of 1. Without further examination of the underlying sales data, a ratio of 0.9 would tend to indicate that Martin's assessments undervalue improved real property, *i.e.*, that improved property sold for more than its assessed value. As plaintiffs painstakingly demonstrated at trial, however, Martin made a number of serious errors that grossly distorted the sales prices of several of the qualified properties, (*see* Tr. II at 119–178), such as, counting one transaction of several parcels of property at one total dollar figure as

separate sales of each parcel at the dollar figure. For example, Martin listed Equivest's purchase of the seven Elysian Hotel properties for a total of $13,000,000 as *$13,000,000 for each of the individual seven parcels!* Although Martin allocated separate assessed values to each of the individual parcels, he listed the full $13,000,000 seven times, once for each the seven properties. From this transaction alone, then, the aggregate sales value was overstated by $78,000,000 (6 × $13,000,000). All in all, Martin had to concede that over $109,750,000 was improperly included in the aggregate value of qualified arms-length sales of improved property listed on Exhibit J–13, which reduced the denominator of the ratio from $268,702,405 to $158,952,405. The corrected and more accurate proportion of $243,003,827 divided by $158,952,405 gives a ratio of 1.53, rather than 0.9. This means that Martin's method of mass appraisal assesses improved real property in the Virgin Islands an average of one-and-one-half times its actual, market value. Thus, one of the universally recognized method of evaluating the reliability and credibility of the assessment values produced by a mass appraisal system conclusively confirms that Martin's system of assessment is not reliable, not credible, and fatally flawed.

## 2. Building Costs: Unreliable and Overstated

The replacement cost new values generated by the Tax Assessor for plaintiffs' properties generally are unreliable, incredible, and overstated. (*See* Jamron Test., Tr. V at 88.) For example, Martin's per square foot building costs are significantly overstated. (*Id.* at 89–90 (noting that the

and to make whatever re-reviews in the field that may be required," (*id.*, Tr. II at 73–74; Tr. III at 17, 33.) In other words, Martin did not analyze the ratios in the sales ratio reports, (*id.*, Tr. III at 40–43), as would be

expected from Martin's testimony that he was unaware of the acceptable ranges of performance standards for ratio studies as promulgated by IAAO, (*id.*, Tr. II at 73.)

Tax Assessor's replacement cost new figures were "much too high").) In his July 24, 2002 report, special master Hunt stated that his review of the documents and materials at the Tax Assessor's office revealed no reliable market research or documentation to support that the "replacement cost used in the current system has any relationship to actual cost of construction in today's market." (Ex. J–3, Special Master's Report, July 24, 2002, at 9.) Hunt went on to add that the periodic, across-the-board increases to the costs tables described by Martin at trial "increase [ ] concern for accuracy of cost rates in the existing system." (*Id.*) I find Hunt's evidence to be credible, independently adopt his finding, and share his concern for the accuracy of the costs used by the Tax Assessor.

Kenneth Voss, the Tax Assessor's expert consultant, performed single property appraisals of certain of plaintiffs' commercial properties using the cost approach, all of which were significantly lower that those of the Tax Assessor using his computer assisted mass appraisal program. The table immediately following compares the respective cost approach values for these properties. The first column lists Martin's values, the second lists Voss' values, and the third shows the percent by which Martin's values exceed Voss' values.

| | **MARTIN** | **VOSS COST** | **DIFFERENCE** |
| --- | --- | --- | --- |
| Shell Seekers | $1,307,660 | $1,167,000 | 12.1% |
| 21 Queen's Quarter | $3,679,780 | $2,715,000 | 35.5% |
| Frostco Building | $4,962,619 | $3,065,000 | 61.9% |
| Buccaneer Mall | $7,361,385 | $6,625,000 | 11.1% |
| Orange Grove Apts. | $5,190,325 | $3,732,000 | 39.1% |

The unreliability and inaccuracy of Martin's appraisals is even clearer when I compare Voss's values using the appropriate income approach to Martin's values using the inappropriate cost approach:

| | **MARTIN** | **VOSS INCOME** | **DIFFERENCE** |
| --- | --- | --- | --- |
| Shell Seekers | $1,307,660 | $1,116,000 | 17.2% |
| 21 Queen's Quarter | $3,679,780 | $2,591,000 | 42.0% |
| Frostco Building | $4,962,619 | $2,859,000 | 73.6% |
| Buccaneer Mall | $7,361,385 | $6,576,000 | 11.9% |
| Orange Grove Apts. | $5,190,325 | $2,100,000 | 47.2% |

In every instance, the Tax Assessor's methodology produced a statistically significant higher value than his own expert. Martin tried to explain the difference, at least in regard to the cost approach, by criticizing Voss's use of Marshall & Swift Valuation Service ["MVS"] for cost data as not being representative of Virgin Islands building costs, notwithstanding that MVS is "an industry recognized cost estimation source which [courts] generally find helpful," *Industrial Equities Group, LLC v. County of Anoka*, 1999 WL 1116799 *3 (Minn.Tax Nov. 30, 1999), and notwithstanding that Voss used adjustments to the MVS data "including the appropriate local and current cost multipliers." (*See, e.g.,* Summ. Appraisal Report of The Frostco Building at 27 (Ex. J–50).) One of plaintiffs' expert appraisers, Steven Jamron, also testified that the MVS cost estimates include adjustments for Virgin Islands building costs and that MVS is a reliable source of cost information. (Jam-

ron Test., Tr. VII at 11–12, 18.) I find Jamron's testimony on this issue to be credible, and the Tax Assessor's testimony relating to his costs data not to be credible, as shown by the discrepancy between his figures and those of his consultant.

### 3. Depreciation: Unreasonable and Erratic

The second step of the cost approach is to subtract the accumulated amount of depreciation from the replacement cost new of the improvement. The longer the period, the slower the depreciation accumulates and the higher the appraised value will be. Further evidence of the Tax Assessor's systematic failure to produce reliable actual values through exclusive use of the cost approach to assess plaintiffs' properties is his selection and application of depreciation, very often a 110 year straight-line depreciation schedule. All the expert appraisers testified that a maximum of sixty years might be acceptable in some instances, although a thirty- to forty-year depreciation schedule was more appropriate, and that a 110 year depreciation period was unreasonably long. (Conroy Test., Tr. IV at 254–255; Jamron Test., Tr. V at 84–85.) Significantly, Martin's own expert consultant, Kenneth Voss, used forty- to sixty-year depreciation periods rather than 110 years. (Martin Test., Tr. VI at 176–177.)

Further compounding the problems with the Tax Assessor's application of the cost approach is his unfathomable practice of arbitrarily resetting the "effective year" of a building's construction, rather than the actual year of construction, for commencing depreciation. Even though it may be necessary or appropriate to estimate the effective year of construction when the actual year cannot be determined or the building has sufficiently changed by remodeling or alterations, (see Manual at 211), the Tax Assessor has moved the effective year to a later year and thereby significantly reduced the accumulated depreciation of plaintiffs' properties without any indication that the properties had been remodeled and in the face of evidence that they needed significant repairs. Martin offered little evidence to support his office's designation of the effective year of construction of plaintiffs' properties, and I find that this manipulation of effective age of plaintiffs' properties unreasonably lowered their depreciation and artificially increased their assessed value so that it bears little relation to actual value.

### 4. Land Values: Unreliable and Unverifiable

The third and last step of Martin's use of the cost approach, adding the land value to the depreciated cost of the improvements, is also calculated systematically to produce unreliable estimates of actual value. Martin testified that he used a computer printout of sales between 1997 and 1999 of comparable vacant parcels throughout the Virgin Islands, which he analyzed to determine the adjusted per-acre value of raw land and then wrote these figures on maps of areas of St. Thomas known as value maps. The Tax Assessor repeatedly failed to produce these "working" documents during pre-trial and in-trial discovery, despite being ordered to do so a number of times. Ultimately, the Tax Assessor admitted that those documents could not be found. This unreliability is exacerbated by Martin's use of a "hidden" and unreviewable modification factor to arrive at the land values of plaintiffs' properties.

The hidden multiplier seems to work as follows. The land values for plaintiffs' properties are determined by multiplying the Tax Assessor's per acre price by the acreage, multiplying the result by disclosed modification factors for acreage and topography, as appropriate, then multiplying this number by a hidden and undisclosed modifier that appears to be related

to across the board increases to the land value tables buried in the bowels of the Tax Assessor's mass appraisal computer program. Martin acknowledged that the basis for the increases are not disclosed on any document available to the public at the Tax Assessor's office. (Martin Test., Tr. IV at 48–49.) Most important for the reliability of the assessment values produced by the Tax Assessor, however, is the lack of any relationship between these across-the-board increases to conditions in the marketplace between 1997 and 1999. (Jamron Test., Tr. V at 92–93.) To cap it off, Martin could not explain how he arrived at his across-the-board increases because he could not locate notes he said would indicate how he arrived at those increases. (Martin Test., Tr. VI at 133–134, 139–140, 182.) [22]

I find Martin's unreliable and overstated building costs, his unreasonable and erratic depreciation schedules, his unreliable and unverifiable land values, as confirmed by the ratio studies, to be powerful and convincing evidence that the Tax Assessor's office systematically employs a method of assessment not calculated to determine the actual value of real property.

## VI. THE REMEDIES

### A. Plaintiffs' Are Entitled to a Permanent Injunction

#### 1. Equitable relief under 42 U.S.C. § 1983

■ I have already found that the plaintiffs proved their claim that Martin violated their civil rights by systematically employing a method of assessment not calculated to determine the actual value of their properties.[23] Plaintiffs thus have clearly prevailed on the merits, and two of the other three factors for permanent injunctive relief favor plaintiffs and are easily resolved, namely, the public interest and the balance of the respective harms. The public interest undeniably weighs in favor of a mandate ordering the executive arm of the Virgin Islands Government to comply with federal law and enjoining it permanently from violating that federal law. *See St. John–St. Thomas Hotel & Tourism Ass'n, Inc. v. Government of the Virgin Islands*, 41 V.I. 317, 1999 WL 376873 (D.V.I.1999), *rev'd on other grounds*, 218 F.3d 232 (3d Cir.2000). The mere statement of the competing harms resolves the third factor in plaintiffs' favor—the injury to plaintiffs of allowing Martin to continue the illegal property assessments versus the harm to the Government of stopping those illegal assessments.

Moreover, the facts of this case compel that I discount any harm the defendants may claim an injunction will cause because the defendants' own recalcitrance will have caused that "injury". *See Opticians Ass'n v. Independent Opticians*, 920 F.2d 187, 197 (3d Cir.1990) ("By virtue of this recalcitrant behavior, the [party opposing the injunction] can hardly claim to be harmed, since it brought any and all difficulties occasioned by the issuance of an injunction upon itself.").[24] After agreeing to bring

---

**22.** Martin also applied an additional ten percent increase in commercial land values for tax year 1999, (Martin Test., Tr. III at 47–48, 57, 62–63), which he discussed on a talk-radio program on July 25, 2000, (Runyon Test., Tr. II at 6–8.)

**23.** Plaintiffs having prevailed on their statutory § 1983 claims against Martin, it is unnecessary to address their constitutional § 1983 claims based on the Equal Protection Clause of the Fourteenth Amendment.

**24.** *See also Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir.2002) (noting that whatever harm an injunction would cause "may be discounted by the fact that the defendant brought that injury upon itself."); *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 806 (3d Cir.1998) ("The

the property assessment procedure and practice into compliance with federal law via the *Berne* Settlement of December 19, 2000, the defendants first delayed that process for two years and then had Martin testify that the agreement did not require them to modify their practices and procedures or to conform to USPAP. (Martin Test., Tr. II at 82.) Consequently, any harm defendants may suffer as a result of the injunction must be discounted by the fact that defendants have been given, and declined to take, every opportunity to fix the numerous problems at the Office of the Tax Assessor without a court injunction.

■ Only the inadequacy of plaintiffs remedy at law requires some discussion. First, the Court of Appeals has ruled that a party need not show inadequacy of legal remedy, including irreparable harm, where the harm is the violation of a statute. *See Government of the Virgin Islands v. Virgin Islands Paving, Inc.*, 714 F.2d 283, 286 (3d Cir.1983). A finding that a violation will harm the public is implicit in the history that 48 U.S.C. § 1401a was enacted to replace a territorial property tax system that was stifling economic growth. Accordingly, the plaintiffs need only show a violation of section 1401a, as they have done, to be entitled to equitable relief under section 1983 without any specific showing of irreparable harm. *See id.; see also Ciba–Geigy Corp. v. Bolar Pharm. Co.*, 747 F.2d 844, 850 (3d Cir.1984) (describing requirements for permanent injunction and omitting irreparable harm); *Southeastern Pa. Transp. Auth. v. Pennsylvania Pub. Util. Comm'n*, 210 F.Supp.2d 689, 726 (E.D.Pa.2002) (finding "convincing the logic of the cases applying a relaxed standard for issuing injunctions upon a showing of statutory violations"); *ReMed Recovery Care Ctrs. v. Township of Willistown*, 36 F.Supp.2d 676, 688 (E.D.Pa.1999) (applying relaxed irreparable harm standard).[25] Second, virtually by definition, money damages are not an adequate remedy because they are not available in a 1983 suit against the Territory or one of its officers acting in his official capacity.

If I need to look further, plaintiffs have otherwise shown the inadequacy of their legal remedy necessary for permanent injunctive relief. *See Temple Univ. v. White*, 941 F.2d 201, 215 (3d Cir.1991); 11A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2944 (2002) (To obtain a permanent injunction, a showing of irreparable injury in the sense of inadequacy of monetary damages "is not an independent requirement for obtaining a permanent injunction; it is only one basis for showing the inadequacy of the legal remedy."). I find that no remedy at law would be adequate to redress this "continuing cycle of litigation and/or continuing [unlawful] assessments." *See Southeastern Pa. Transp. Auth.*, 210 F.Supp.2d at 726 ("the focus of the irreparable harm inquiry is whether ... an adequate remedy at law" is available); *Louis W. Epstein Family P'ship v. Kmart Corp.*, 828 F.Supp. 328, 338–39 (E.D.Pa.1993) (stating that there is "no adequate remedy at law if the injury is of a repeated or continuing character"),

---

self-inflicted nature of any harm suffered by [the party opposing the injunction] also weighs in favor of granting preliminary injunctive relief.").

25. Later panel decisions, which of course cannot overrule the earlier panel in *Virgin Islands Paving*, would seem to require a showing of irreparable harm. *See, e.g., Natu-* *ral Res. Def. Council v. Texaco Ref. & Mktg., Inc.*, 906 F.2d 934, 941 (3d Cir.1990) and *Rosa v. Resolution Trust Corp.*, 938 F.2d 383, 400 (3d Cir.1991). Although a later panel has recognized this dichotomy, *see Temple Univ. v. White*, 941 F.2d 201, 215 (3d Cir.1991), *Virgin Islands Paving* remains good law as it has not been overruled by the Court of Appeals for the Third Circuit sitting *en banc*.

*aff'd in part and rev'd in part,* 13 F.3d 762 (3d Cir.1994); *Northeast Women's Ctr., Inc. v. McMonagle,* 665 F.Supp. 1147 (E.D.Pa.1987) (noting that irreparable harm is a component of adequacy of the legal remedy and stating "the legal remedy is inadequate if the plaintiff's injury is a continuing one, where the best available remedy would relegate the plaintiff to filing a separate claim for damages each time it is injured anew"), *aff'd in part and remanded,* 868 F.2d 1342 (3d Cir.1987).[26] I also find that plaintiffs will suffer a continuing harm absent an injunction because the Tax Assessor will not even acknowledge that his present system of assessment does not produce credible and reliable appraisals of the actual value of real property. Without an injunction, Martin will continue to illegally assess plaintiffs' properties and the Government will continue to send out excessive and unreliable bills based on those illegal assessments, requiring plaintiffs to file new suits to vindicate their federal right.

Moreover, the administrative remedy the Government purports to provide via the Board of Tax Review is no remedy at all due to the Board's excessive delays, as this Court has consistently held and holds again here. *See, e.g., Anchorage Assoc. v. Virgin Island Bd. of Tax Review,* Civ. No.1984–287, 1991 U.S. Dist. LEXIS 20005, at *18 (D.V.I. Feb. 6, 1991). In the twelve years since the *Anchorage* decision, the Board's effectiveness has not im-

proved. I will not repeat the long history of cases detailing the Board's ever increasing ineffectiveness, as it is set forth in *Berne Corporation v. Government of the Virgin Islands,* 2000 WL 1689787 (D.Vi. 2000) and *Equivest St. Thomas, Inc. v. Government of the Virgin Islands,* 208 F.Supp.2d 545 (D.Vi.2002). In sum, an appeal to the Tax Review Board is not only a non-exclusive option available to an aggrieved taxpayer, it is also a futile option that does not constitute an adequate remedy at law because the Tax Review Board has consistently demonstrated it is incapable of timely resolving tax appeals.

It is clear, therefore, that plaintiffs have satisfied all the prerequisites for equitable relief and are entitled to an injunction under section 1983 to prohibit Martin, acting in his official capacity as Tax Assessor, from continuing to deprive plaintiffs of their federal statutory right to have their property assessed at its actual value per 48 U.S.C. § 1401a.

## 2. Equitable Relief under 5 V.I.C. § 80

To reiterate, 5 V.I.C. § 80 gives a taxpayer the right to bring "an action to restrain illegal or unauthorized acts by a territorial officer or employee, or the wrongful disbursement of territorial funds." In plaintiffs' taxpayer suit on behalf of all payers of real property taxes, they seek to restrain Martin from assess-

---

**26.** *See also Guzman v. Bevona,* 90 F.3d 641, 650 (2d Cir.1996) (stating that "a district court has broad discretion to enjoin possible future violations of law where past violations have been shown."); *New York State Nat'l Org. for Women v. Terry,* 886 F.2d 1339, 1362 (2d Cir.1989) (affirming, in part, injunction prohibiting blocking of clinic because "the harm will be of a continuing nature absent an injunction"); *Martin v. Shell Oil Co.,* 180 F.Supp.2d 313, 323 (D.Conn.2002) (harm of a continuing nature can constitute irreparable injury justifying permanent injunction); *Ga-*

*lella v. Onassis,* 353 F.Supp. 196, 235 (S.D.N.Y.1972), *aff'd in part and rev'd in part,* 487 F.2d 986 (2d Cir.1973) (no adequate remedy at law because of "the recurrent nature of plaintiff's invasions of defendant's rights [and] the need for a multiplicity of damage actions to assert defendant's rights"); *Local Union 499 v. Iowa Power & Light Co.,* 224 F.Supp. 731, 738 (S.D.Iowa 1964) (finding irreparable harm because "where there is a likelihood of such recurring and constant injury, damages may not be an adequate remedy").

ing real property in the Virgin Islands and the Government from requiring payment of real property taxes until (1) such taxes and assessments are redetermined based on the actual value of each property, as required by 48 U.S.C. § 1401a and (2) the Board of Tax Review consistently holds hearings and decides appeals within the time presently required by 33 V.I.C. § 2452, and the Government, through its Commissioner of Finance, consistently remits all refunds resulting from Board decisions within the time presently required by section 2451(a).

■ To bring an action under section 80, all the plaintiffs must establish is that they pay Virgin Islands taxes. The statute imposes no minimum threshold on the amount of taxes paid, no requirement that plaintiffs suffer any special damages other than those suffered by all similarly situated taxpayers, no requirement that the allegedly illegal act the taxpayers seek to restrain involves property to which their tax payments have contributed, and no requirement that the illegal acts have to do with public funds or public property. I draw these conclusions from a section 80 taxpayer suit in this Court that similarly involved real property and challenged the validity of a local statute as violating a federal statute. The Government sold a piece of property pursuant to special local legislation that directed the Commissioner of Property and Procurement to sell the property to a specific private individual. Taxpayers brought suit in this Court under 5 V.I.C. § 80 on behalf of themselves and other Virgin Islands taxpayers against the Government, the Commissioner, and the purchaser to declare the sale illegal and void and for injunctive relief.

This Court initially agreed with the Government that the taxpayers lacked the capacity to sue under section 80 and dismissed the complaint. The Court of Appeals reversed and remanded for a trial on the merits, holding that

the alleged minuteness of the amount of the present taxpayers' interests may not be urged as a ground for denying them standing to sue. For the statute does not impose upon them any requirement as to the minimum amount of their taxes, either in absolute terms or in relation to the amount of funds or property involved in the suit. It merely requires a showing that they are territorial taxpayers. Having made such a showing the plaintiffs are entitled under the statute to sue to restrain illegal or unauthorized acts by a territorial officer or employee .... Moreover the statute does not require that the alleged illegal act which is sought to be restrained involves public funds or property to which the plaintiffs' tax payments have contributed, or even that the alleged illegal act involves the public funds or property at all. For us to hold otherwise would be to put an unwarranted gloss upon the statute and to defeat pro tanto its salutary purpose.

*Smith v. Government of the Virgin Islands*, 329 F.2d 131, 134 (3d Cir.1964). This salutary purpose of section 80 is that "of enabling taxpayers to obtain the aid of the district court to restrain any illegal acts of territorial authorities .... Such suits ... serve a very useful public purpose in keeping within legal bounds the actions of government officers ...." *Id.* at 133. The Court of Appeals specifically rejected the suggestion that the plaintiff in a section 80 suit must show some special damage to herself that was different in character from that suffered by the general body of taxpayers, for "the Virgin Islands statute imposes no such requirement." *Id.* at 134.

After a bench trial on remand, this Court found the local special legislation disposing of government property to a

specific private person violated a federal statute, 48 U.S.C. § 1471. Section 1471 provided that "the legislatures of the Territories of the United States now or hereafter to be organized shall not pass local or special laws ... granting to any ... individual any special or exclusive privilege, immunity, or franchise whatever." Without applying or even mentioning the usual factors needed for equitable relief, this Court voided the statute and rescinded the sale. See *Smith v. Government of the Virgin Islands*, 240 F.Supp. 809, 810–11 (D.Vi.1965).

On the second appeal, this time by the Government, the Court of Appeals reiterated that 5 V.I.C. § 80 imposes

> no requirement that a taxpayer must show his liability for any minimum amount of taxes either in absolute terms or in relation to the amount of the property involved in the suit, or to show any special damage to himself different in character from that suffered by the general body of taxpayers.

*Smith v. Government of the Virgin Islands*, 375 F.2d 714, 715–16 (3d Cir.1967). The Court of Appeals then affirmed this Court, finding that 48 U.S.C. § 1471 applied to the Territory of the Virgin Islands and that the local act

> singled out [one person] from all other citizens and discriminated against them by granting to him an exclusive privilege to acquire the parcel of land. This arbitrary action violated the specific prohibition of 1471 against the passage of a special law "granting to any ... individual any special or exclusive privilege ... whatever."

*Id.* at 717. The Court of Appeals did not require or even mention the need to assess the public interest, to balance the respective harms, or to determine the inadequacy of a plaintiff's legal remedy before granting injunctive relief under 5 V.I.C. § 80.

Regarding plaintiffs' claim against the Board of Tax Review, I note that the Virgin Islands is within its rights to require a property owner first to pay the tax and then to apply to an administrative agency for a refund. When it does so, however, the administrative process must provide an adequate remedy and if it does not, then the Territory's legal compulsion to first pay the tax denies the taxpayer the due process of law. *See Reich v. Collins*, 513 U.S. 106, 115 S.Ct. 547, 130 L.Ed.2d 454 (1994) (stating that, "[d]ue process requires a 'clear and certain' remedy for taxes collected in violation of federal law"). The Virgin Islands Code provides that "any person aggrieved by the action of the assessor in relation to the value of his property *may* make written complaint thereof to the Board of Tax Review," *see* 33 V.I.C. § 2451(a) (emphasis added),[27] as long as he also "pay[s] an amount equal to the full amount of the assessment [sic] for the tax year previous to that ... being appealed."[28] 33 V.I.C. § 2451(b). The Board is required to hold a hearing and

---

**27.** I rejected defendants' claim that Equivest had not exhausted its administrative remedies by failing to first appeal to the Board of Tax Review based on the statute's use of the word "may." Section 2451(a) thus does not require the taxpayer to exhaust this administrative remedy before bringing a taxpayer suit under 5 V.I.C. § 80, especially since the courts of the Virgin Islands are fully operational while the Tax Review Board is ineffective. *See Equivest, St. Thomas*, 208 F.Supp.2d 545, 549 n. 7. My ruling the plaintiffs did not have to exhaust their administrative remedies was upheld by the Court of Appeals. *See Bluebeard's Castle*, 321 F.3d at 397 n. 4.

**28.** I am sure the Legislature intended to require full payment of the current tax bill, not the assessment, inasmuch as the "assessed value shall be the actual value of such property" and the tax to be "levied and collected" is 1.25% of 60% of "such assessed value." *See* 33 V.I.C. § 2301(a).

reach a determination on an appeal within sixty days from the date the appeal is filed. *See id.* at § 2452. If the taxpayer wins the appeal, "the Commissioner of Finance shall refund any excess taxes paid within 30 days of the judgment of the Board of Tax Review." *Id.*[29]

By the Board's own admission, this does not occur. Notwithstanding the fact that anywhere from 500 to 1000 tax appeals are filed annually, the Board has met only *twenty-one times over the past five years,* and has had a quorum of board members present only for approximately half of those meetings. (Turnbull Test., Tr. IV at 156.) Based on these numbers, the Board would need to resolve hundreds of appeals each time it meets, a level of productivity it has never approached. Indeed, the Board takes up to seven years, and usually from three to five years, to schedule a hearing on an appeal. Even when and if the Board makes a determination that results in a refund to the taxpayer, the Department of Finance does not pay the taxpayer within thirty days of the Board's decision, as required by 33 V.I.C. § 2451(b).

Although I believe a taxpayer suit to restrain illegal governmental activity under section 80 requires no more that the payment of taxes and proof of the illegality, plaintiffs clearly have satisfied the customary four prongs required for equitable relief. I incorporate my findings from the preceding section and here find that the inability of the defendants to compensate the plaintiffs with money damages also satisfies the irreparable injury prong. As an element of irreparable harm, I look to the financial strength of the Government to determine whether or not the defendants would be able to compensate the

plaintiffs with money damages. *See West Indian Co. v. Government of the Virgin Islands,* 643 F.Supp. 869 (D.Vi.1986) (citing *Eli Lilly & Co. v. Premo Pharm. Labs,* 630 F.2d 120, 137 (3d Cir.1980)). I have no difficulty finding that it is more likely than not that the Government of the Virgin Islands will not be able to pay damages, for the Governor himself has admitted as much. In a statement issued a few days after he granted paid leave to "nonessential" employees to attend the main Carnival events on St. Thomas during the last week of April,[30] Governor Turnbull confessed that if monthly expenditures continue to exceed revenues, "this government will face deferred paydays and ultimately insolvency because the projected deficit for 2003 exceeds $115 million. If we continue at this rate, the government will not have sufficient cash in the month of June to meet all of its necessary obligations." Marty Schladen, *$115 Million Deficit: V.I. on the Brink of Bankruptcy,* VIRGIN ISLANDS DAILY NEWS (Apr. 25, 2003). The Governor's admission thus amply corroborates the testimony at trial of the Commissioner of Finance, Bernice Turnbull, that the government experienced "a serious cash position" in December. (Turnbull Test., Tr. IV at 119.) The Commissioner similarly testified before the Committee of the Whole of the Virgin Islands Legislature on January 28, 2003 to the precarious nature of the Government's cash flow: as of that morning, the total cash was $18.7 Million and the government payroll was $14.2 million every two weeks. Likewise, in a case in which the United States has been attempting to force the Government of the Virgin Islands to comply with a consent decree it willingly executed in 1985, the Government has been unable to

---

**29.** Similarly, if the taxpayer loses, she must pay any balance due within thirty days. 33 V.I.C. § 2451(b).

**30.** *See* Marty Schladen, *Turnbull Gives Many V.I. Workers Paid Leave for Carnival,* VIRGIN ISLANDS DAILY NEWS (Apr. 24, 2003).

comply with my order of December 19, 2001, to deposit a mere $5 million into the St. Croix sewage corrective action fund. *See United States v. Government of the Virgin Islands,* Civ. No. 1984–104, 2001 WL 1727256 (D.V.I. Dec.19, 2001).

 I also take judicial notice of recent media reports that confirm the depth of the financial crisis and rebut Commissioner Turnbull's attempt to suggest at trial that the Government's finances were fine and the problem was only temporary. *See* Marty Schladen and Nancy Cole, *Projected FY 2003 Deficit Worse Than What Turnbull Inherited,* VIRGIN ISLANDS DAILY NEWS (Apr. 28, 2003); Aril Bruce, *VI in "Financial Crisis"* . . . *Once More,* AVIS (Apr. 27–28, 2003); Chris Larson, *V.I. Fiscal Crisis: Strategies and Strife,* VIRGIN ISLANDS DAILY NEWS (Apr. 26, 2003); *Chronology of a Crisis: Events leading V.I. to the Brink of Bankruptcy,* VIRGIN ISLANDS DAILY NEWS (Apr. 26, 2003); Molly Morris, *Cash Flow Problem is a "Fiscal Crisis" After all,* ST. THOMAS SOURCE (Apr. 26, 2003), *at* www.onepaper.com/stthomasvi; Dan Kuemmel, *SOS—Government a Sinking Ship,* AVIS (Apr. 25, 2003); Marty Schladen, *$115 Million Deficit: V.I. on the Brink of Bankruptcy,* VIRGIN ISLANDS DAILY NEWS (Apr. 25, 2003); Valerie Lovett, *V.I. Facing $100M Deficit for FY 2003, Turnbull Says,* ST. THOMAS SOURCE (Apr. 25, 2003), *at* www.onepaper.com/stthomasvi; Valerie Lovett, *Minority, Majority Spar over "Fiscal Crisis",* ST. THOMAS SOURCE (Apr. 3, 2003), *at* www.onepaper.com/stthomasvi; Joy Blackburn & Chris Larson, *Finance Authority Advances Government $7 million to Cover its Operating Costs,* VIRGIN ISLANDS DAILY NEWS (Mar. 28, 2003); Jean P. Greaux, Jr., *Austerity Measures May Delay Full–Blown Crisis,* ST. THOMAS SOURCE (Mar. 28, 2003), *at* www.onepaper.com/stthomasvi; Chris Larson, *Senators Hear VI Payroll is in Peril,* VIRGIN ISLANDS DAILY NEWS (Jan. 29, 2003) (noting that several government officials referred to a "current cash crunch" and "cash-flow crisis" and noting the statement of Louis Willis, Director of Bureau of Internal Revenue: "I don't know how we are keeping afloat, but we are"); Molly Morris, *It's "Day–to–Day" Financing Now,* ST. THOMAS SOURCE (Jan. 28, 2003) (same), *at* www.onepaper.com/stthomasvi.

Unquestionably, all of the plaintiffs are Virgin Islands taxpayers who have sued on behalf of themselves and all other similarly situated Virgin Islands property taxpayers. Consequently, I find that plaintiffs are qualified to sue the Tax Assessor and the Government, including the Board of Tax Review. I find further that plaintiffs' have established their right and the right of all property owners in the Virgin Islands to a decree restraining the Tax Assessor from assessing real property in the Virgin Islands and the Government from requiring payment of real property taxes, beginning with tax year 1999, *until* such taxes are based on a system of assessment that reliably and credibly assesses real property in the Virgin Islands at its actual value *and* the Board of Tax Review and the Department of Finance consistently afford property taxpayers a constitutionally adequate administrative review and remedial process under local law.

### 3. Scope of Permanent Injunction

 The plaintiffs having established their entitlement to injunctive relief, I will issue a permanent injunction against Roy Martin, in his official capacity as the Tax Assessor for the Government of the Virgin Islands, pursuant to 42 U.S.C. § 1983, enjoining Martin from assessing any of the named plaintiff's real properties until he establishes a reliable and credible system that will appraise real property consistently at its actual, market value in compliance with 48 U.S.C. § 1401a. Under this Court's supplemental jurisdiction pursuant

to 5 V.I.C. § 80 to restrain illegal and unauthorized acts of territorial officers and employees, I will similarly enjoin Roy Martin, in his official capacity as the Tax Assessor, from such illegal assessments, and I will also enjoin the Government of the Virgin Islands, and any of its departments, agencies, and employees, from issuing any tax bills until there is in place an assessment system that will reliably and credibly appraise real property at its actual, market value *and* from seeking to collect any property tax bills issued on commercial property as of tax year 1999.[31] Thus, the Government will be enjoined from further implementing the recently passed Act No. 6574. As presently written, Act 6574 is void as requiring commercial property owners to pay bills for tax years 2001, 2002, 2003, and 2004 based on the illegal assessment made in the year 1999. Because the 1999 property tax bills are illegal, being produced by an assessment system that violates federal law, the 1999 bills cannot form the basis for payment of property taxes for later years, unless the Legislature further amends 33 V.I.C. § 2402 to provide for retroactive adjustment of the bills for 1999, 2000, 2001, 2002, 2003, and 2004, once a fair and equitable system capable of consistently assessing their properties at their actual values is in place.[32] The provision for retroactive adjustment would have to cover both overpayments, which could be credit-

ed against future property taxes, and underpayments, for which the taxpayer would be billed retroactively.

The section 80 injunction retraining the Government from issuing any further tax bill and from seeking to collect any existing tax bills beginning with tax year 1999, as well as enjoining the Tax Assessor from any further illegal assessments extends to all real property owners and real property in the Virgin Islands, including vacant land, agricultural land, commercial properties, residential properties, condominiums, and timeshare units, because plaintiffs cover the complete spectrum of taxpaying real property owners who complained that the Tax Assessor's method of assessment was not calculated to determine actual value.[33]

Finally, the injunction shall remain in place until the Board of Tax Review consistently holds hearings and reaches decisions on all appeals within the sixty days as presently required by 33 V.I.C. § 2452, and the Government, through its Commissioner of Finance, consistently remits any refunds resulting from the Board decision within thirty days of the Board's decision as presently required by 33 V.I.C. § 2451(a). The Legislature may wish to revisit the time periods for decision and payment and modify them to provide longer periods, as long as the revised time frame is reasonable.

---

**31.** I find that the appropriate cut-off date is tax year 1999 as it was the first year challenged in *Berne*.

**32.** The Legislature handled the aftermath of Hurricane Marilyn by allowing retroactive credit for 1994 taxes. *See* Act Aug. 29, 1995, No. 6078, § 4, Sess. L.1995, p. 203 ("Notwithstanding any other provision of law to the contrary, all property taxpayers who have paid their 1994 residential property tax bills prior to the enactment of this act, shall, be entitled to have a credit applied to their subsequent year's tax bill for any excess which

may have accrued as a result of the payment of their 1994 residential property tax bill."). Under our system of property taxation, the 1994 bills were due no later than September of 1995, the month Hurricane Marilyn devastated the Islands.

**33.** It is possible that Act 6574 could be expanded to cover all property and property owners from 1999 through 2004 tax years. The provision for retroactive adjustment as outlined in the text could provide a basis for lifting this part of the injunction.

## B. The Berne Settlement Agreement Will Be Enforced

The parties negotiated a settlement of the *Berne* case, which was approved on December 19, 2000. The Government and the Tax Assessor agreed to bring the Virgin Islands real property tax system into compliance with the federal requirement that property be assessed on its actual value, which I have found to be the same as its market value. The parties agreed that the Tax Assessor would develop and implement "the procedures and process to be used by the Virgin Islands Tax Assessor's office in appraising commercial properties pursuant to a mass appraisal approach and Uniform Standards of Professional Appraisal Practice ('USPAP') Standards." The parties further agreed that the Court would appoint a mutually agreed upon special independent master who would review the process and, ultimately, certify the new procedures as proper and test them for compliance through a random sampling of ten percent (10%) of assessments to ensure that the new system produces credible and reliable fair market values. The project would take two years and the special master would report to the Court on compliance every 180 days. (*See* Ex. 10.)

In his initial report in January of 2002, Hunt described in detail his "extensive review of assessment procedures; mass appraisal methodologies; assessment system components (including data base records for court case properties), and the organizational approach for administering the assessment function" then in place at the Tax Assessor's Office. (Ex. J–2, Special Master's Report, Jan. 15, 2002, at 1.) He identified and discussed USPAP's seven steps of a mass appraisal system and described the current level of compliance by the Tax Assessor. Hunt presented his recommendations for bringing each step of the system up to an acceptable level of compliance and tax consultant Voss' plan in response to those recommendations. Although the consultant's plan was a good start on the planning phase of this project, it

> lacks the sufficient detail necessary to make manpower and cost estimates that are needed to seek funding for the project. Additional detail on order of events and work projects in the plan is also necessary to properly manage the project. The work plan should be expanded as soon as possible.

(*Id.* at 16.)

Hunt placed great emphasis on the importance of developing good valuation models for the cost approach, the sales comparison approach, and the income approach "that are capable of appraising the properties in the Virgin Islands and that will satisfy the accuracy and uniformity requirements of the mass appraisal."

> The models must be capable of explaining the relationship of "Actual Value" for a property and the property characteristics and market variables that represent factors of supply and demand.... The cost approach must be customized to the building types found in the Virgin Islands and have the capacity to adjust to the variety of interior finishes permitted by weather and climate conditions in the islands. Market adjustments that result from terrain, storm exposure, flood, etc. must be built into the models. An income approach for mass application and calibration techniques must be developed and local market income and expense variables be researched and maintained.

(*Id.* at 20.) He strongly recommended that Martin direct the consultant to expand his work Plan "to include greater detail on each project phase and to include time line, manpower requirements and cost estimates required to complete the

project," with selecting the valuation methodology and valuation models a high priority because "so much of the remaining project is dependant on this decision." (*Id.* at 20–21.)

Unfortunately, very few if any of these recommendations had been accomplished by Hunt's next report on July 24, 2002:

> Progress to date on the reappraisal of all commercial property in the Virgin Islands has been sporadic, piecemeal, and is not following an orderly planning and implementation process consistent with accepted mass appraisal techniques. Much of the work accomplished may be useful in the final analysis; however, to continue with the disorganized approach demonstrated at this point will very likely result in an inferior final product, and getting locked into decisions that would not be the first choice if a more orderly process was followed. The current level of staffing in the normal workloads in the Assessor's office does not permit consistent activity on the reappraisal project with the current staffing levels. A considerable amount of the valuation consultant's time has been necessarily directed to the large property tax appeal activity that has occurred since the settlement agreement that directed this reappraisal activity. It is my observation that the necessary funding to go forward with the reappraisal project, in a timely manner, has not been forthcoming.

(Ex. J–3, Special Master's Report, July 24, 2002, at 10.)

Voss' letter to Hunt of October 2, 2002, confirmed this last paragraph that the reappraisal project and thus the *Berne* Settlement had been stymied by lack of funding by the Legislature and that much of Voss' time was consumed by this litigation. (Ex. J–12, Voss letter, Oct. 3, 2002.) Voss reported that the Finance Committee of the Legislature had removed his budget for the reappraisal project, although Martin "indicated the money has been set aside." There was no confirmation presented by the defendants at trial that funding was in place or whether Voss was continuing to act as consultant to the Tax Assessor. Martin's representation that Hunt presently is "waiting for the revised work plan from the consultant that is working for the government in the Office of the Tax Assessor," (Martin Test., Tr. II at 50), was flatly contradicted by the statement of defendants' counsel that Voss is off the job due to a breakdown in his relationship with Government, (Tr. II at 218.). From my observation over the years, such breakdowns usually stem from the Government's failure to meet its financial obligations.

Defendants seem to contend that all of USPAP is inapplicable to the Tax Assessor because of its "Jurisdictional Exception Rule" included in the *Berne* Settlement. This rule would merely serve to sever and save the rest of Standard 6 of USPAP on mass appraisal if one of its parts is contrary to the law or public policy of the Virgin Islands. Thus, at best, the jurisdictional exception rule could only apply to section 2404(b)'s limitation on use of the income capitalization approach for assessment of commercial property that renders it inconsistent with USPAP, leaving all the rest of Standard 6 intact. (*See* Hunt Test., Tr. I at 131–132.) Inasmuch as I have ruled that section 2404(b) violates 48 U.S.C. § 1401a and is void and of no effect, there is no basis upon which the defendants may invoke application of the jurisdictional exception rule.

As is evident from broad language of the *Berne* Settlement itself, the improvements it requires the Tax Assessor to make to the mass appraisal system are intended to benefit all commercial property owners as intended third-party beneficiaries of the

*Berne* Settlement. By judicial admission the defendants have extended the benefits of the *Berne* Settlement to all real property owners in the Virgin Islands, including owners of residential and agricultural property, as noted above in section IV.C.

 I find that defendants have materially breached the *Berne* Settlement by failing to fund the reappraisal project adequately, by failing to adopt the recommendations of the special master, and by otherwise failing to correct the mass appraisal practice and procedure that would enable Hunt to certify such procedures to be proper and to verify through random sampling that the corrected mass appraisal computer program produces actual value assessments. I will order the *Berne* Settlement to be specifically performed by defendants to ensure that all real property in the Virgin Islands subject to property tax is appraised, assessed and taxed at actual, market values in accordance with 48 U.S.C. § 1401a and the Uniform Standards of Professional Appraisal Practice. I also will extend the term of the Joseph Hunt as special master, at defendants' expense, until such time as he submits, and the Court approves, his final report certifying that the procedures used by the Office of the Tax Assessor are proper and generate credible and reliable assessments of actual/market values.

To ensure sufficient funding I will order the opening of a separate bank account, titled "The Actual Value Property Tax Assessment Fund," to be used exclusively for the implementation of the *Berne* Settlement. Initially, the bank account shall be funded from the reasonable estimates of the property taxes the plaintiffs will otherwise pay to the Department of Finance, which will be credited against their property tax obligations as finally redetermined once the property tax assessment system satisfies federal law.

**DECREE**

Having considered the entire record in this matter, including the testimony and documentary evidence presented at the trial on January 6–10, 21, and 22, 2003, and based on the Memorandum of even date, it is hereby,

1. **DECREED** that Roy Martin, in his official capacity as Tax Assessor of the Virgin Islands, and thereby the Government of the Virgin Islands are permanently enjoined pursuant to 42 U.S.C. § 1983 from violating plaintiffs' federal right under 48 U.S.C. § 1401a to have their real property assessed at its actual value, and, it is further

2. **DECREED** that Roy Martin, in his official capacity as Tax Assessor of the Virgin Islands, and the Government of the Virgin Islands are restrained pursuant to 5 V.I.C. § 80 from continuing to commit the illegal and unauthorized acts of assessing any and all real property in the Virgin Islands, **UNTIL** the property tax system has been certified as reliably and credibly assessing and taxing all real property on its actual value **AND UNTIL** the Board of Tax Review consistently holds hearings and reaches determinations on appeals within the sixty (60) days required by 33 V.I.C. § 2452, and the Department of Finance consistently remits any refunds awarded by the Board decision within the thirty (30) days required by 33 V.I.C. § 2451(a), and it is further

3. **DECREED** that Act No. 6574 is void and of no effect and that, effective immediately, the Government, shall make no further effort to collect any tax bills already issued for any property, commercial or otherwise, for tax years 1999, 2000, and 2001, **NOR SHALL** the Government issue any property tax bills for tax year 2002 and beyond, for any property, commercial or otherwise, **UNLESS, AND UNTIL,** the Legislature amends 33 V.I.C.

§ 2402 to provide for retroactive adjustment of the bills on all classes of property for 1999, 2000, 2001, 2002, 2003, 2004, and for a reasonable time thereafter until a fair and equitable system capable of reliably and credibly assessing all real property at actual value is in place, and it is further

4. **DECREED** that the Government of the Virgin Islands and Roy Martin, in his official capacity as Tax Assessor of the Virgin Islands, shall fully, promptly, and diligently comply with all the conditions and perform all the terms of the settlement agreement entered into with the plaintiffs in *Berne Corp. v. Government of the Virgin Islands,* Civil 2000–141, and 21 *Queens Quarter v. Government of the Virgin Islands,* Civil No.2000–167 [*"Berne* Settlement Agreement"].

The Court further enters the following **Orders** to implement the foregoing injunctive relief:

1. As part of the enforcement of the *Berne* Settlement Agreement, the Government shall renew, extend and continue the appointment of Mr. Joseph Hunt to oversee implementation of the *Berne* Settlement Agreement, provided that Mr. Hunt consents to said extended appointment. Mr. Hunt shall continue to report to the Court on the progress therewith on a biannual basis until further order of the Court.

2. The Government of the Virgin Islands and the Tax Assessor are herewith directed to make available to Mr. Hunt and agents any and all documents and records as Mr. Hunt may deem reasonably necessary to complete the obligations of his extended appointment.

3. All expenses associated with the extended retention of Mr. Hunt shall be the sole and exclusive obligation of the Government of the Virgin Islands and Roy Martin, in his official capacity. Mr. Hunt is herewith authorized to retain such additional persons and expend such additional sums as he reasonably believes are necessary to fully implement the *Berne* Settlement Agreement. All expenses associated therewith incurred by Mr. Hunt shall be the sole and exclusive obligation of the Government of the Virgin Islands.

4. Given the recalcitrance of the Government, including the Legislature, in adequately funding the *Berne* Settlement Agreement, a special fund titled "The Actual Value Property Tax Assessment Fund" ["the Fund"] shall be established by the Commissioner of Finance in a separate interest bearing bank account at a bank authorized to do business in the Territory of the Virgin Islands. The Fund and its bank account shall be funded from the property tax payments the plaintiffs to this litigation would otherwise pay to the Department of Finance, and their payments into the Fund will go toward satisfaction of their property tax obligations as finally redetermined once the property tax assessment system satisfies federal law. If additional monies are needed to fund the implementation of the *Berne* Settlement Agreement, the Government shall ensure that all such additional funds are made available and deposited into the Fund. All monies in the Fund shall be used solely and exclusively for the implementation of the *Berne* Settlement. If, after the completion of the *Berne* Settlement, there are monies remaining in the Fund, such monies shall be used solely and exclusively to maintain the real property tax assessment system in compliance with the Uniform Standards of Professional Appraisal Practice ["USPAP"].

A. Mr. Hunt, in consultation with the Tax Assessor and any other consultants he deems appropriate, shall prepare an overall budget for however long it will take to staff, equip, complete and implement the *Berne* Settlement Agreement and submit it to the parties for review and then to the Court for approval.

B. The plaintiffs shall make good-faith estimates of the property taxes they owe and submit them to the Tax Assessor. If the parties cannot reasonably agree, they shall submit their figures to the Court for final decision.

C. Mr. Hunt, the Commissioner of Finance, and the Attorney General, shall confer and devise a mutually acceptable procedure for submitting, approving and timely paying all invoices and costs associated with implementing the *Berne* Settlement out of the Fund.

D. Mr. Hunt, the Attorney General or his representative, the Commissioner of Finance or her representative, and the plaintiffs shall report to the Court no later than May 28, 2003, on the progress they are making toward setting up and funding the Fund and establishing the procedures for drawing checks on the Fund, and a status hearing will be held at 2:00 p.m. on Friday, May 30, 2003.

5. The Government may apply to the Court for an Order modifying or vacating any or all of these Orders at such time as the Government has adopted a system of property taxation that is compliant with 48 U.S.C. § 1401a, and with applicable portions of USPAP, and upon the written recommendation from the Special Master to that effect. This Court will review the report and recommendations of Mr. Hunt and will determine whether and when the defendants have completed the requirements of the *Berne* Settlement Agreement and brought the Virgin Islands property tax system into compliance with federal law (48 U.S.C. § 1401a) to assess all real property at its actual value, *i.e.*, fair market value.

6. Each Plaintiff in the consolidated cases is awarded costs of suit incurred thus far, including reasonable attorneys fees and costs, as shall be determined upon due application to this Court as each individual case is completed.

7. This Court retains jurisdiction to enforce the terms and conditions of the *Berne* Settlement Agreement, to enforce each of the Orders set forth herein, and to take any other action as might be appropriate to effectuate the Judgment entered herein.